ADAMS v. MID-WEST CHEVROLET CORP. et al.

No. 32166. Dec. 10, 1946.

As Corrected on Denial of Rehearing March 4, 1947.

Second Petition for Rehearing Denied April 24, 1947.

*179 P. 2d 147.*

462

Lawrence Mills, Summers Hardy, and Milton W. Hardy, all of Tulsa, for plaintiff in error.

Conner, Winters, Lee & Randolph, Rosenstein & Gore, and Bush, Gable & Gotwals, all of Tulsa, for defendants in error.

**RILEY, J.** This is an action commenced in the district court of Tulsa county by plaintiff in error, herein referred to as plaintiff, against defendants in error, D. B. Winchell, John E. Byers, and Roy F. Godfrey, the directors and officers of Mid-West Chevrolet Corporation, a Delaware corporation, for an accounting and for cancellation of certain shares of stock in said corporation, held by defendants Winchell and Byers. The corporation was made a party defendant.

Plaintiff asserts that it is a derivative action by him on behalf and for the benefit of the corporation, while defendants assert that it is in truth and fact an action brought, not for the benefit of the corporation, but for the benefit of plaintiff in that by the cancellation of all the shares of stock of the corporation held by defendants Winchell and Byers, plaintiff would thereby become the owner of substantially all the remaining stock of the corporation and in control thereof.

The corporation was organized in January, 1931, under the laws of Delaware, with an authorized capital stock of 10,000 shares of the par value of $10 each, divided into two classes, A and B (6,000 shares of Class A and 4,000 shares of Class B). It was organized for the purpose of acquiring the assets and business of Mid-West Chevrolet Company, an Oklahoma corporation, the business of which was buying and selling new Chevrolet automobiles, trucks, etc., and buying, selling, repairing and maintenance of used automobiles, trucks, and other motor vehicles, and buying and selling parts for repairs. No

shares of stock of either class can be sold, assigned, or transferred at any time by any owner or holder other than to another stockholder then of record without first having tendered such stock proposed to be sold, to the corporation for purchase for its own account on equal terms. Class B stock is subject to redemption by the corporation at any time.

At the time of the trial, certificates were outstanding for 2,194 shares of Class A stock and 1,685 shares of Class B stock. Plaintiff Adams was the owner of 344 shares of Class A stock. Defendant Winchell held of record 1,375 shares of Class B stock and 1,850 shares of Class A stock. Defendant Byers held 200 shares of Class B stock. The other shares of Class B stock were held by other employees of the corporation who were not parties to this action.

Plaintiff's amended petition, upon which the action was tried, contains ten causes of action. The record is voluminous and contains some 1,700 pages of pleadings, oral testimony, and exhibits. The exhibits go largely to the corporate records.

The Mid-West Chevrolet Corporation, a Delaware corporation, and the Mid-West Chevrolet Company, an Oklahoma corporation, are separate corporations. Herein, where the Mid-West Corporation is referred to, it means the Delaware corporation, and where the Mid-West Company is referred to, it means the Oklahoma corporation.

Late in 1930 the Mid-West Company became desirous of selling its business. Defendants D. B. Winchell and Hal Hayes, both having had experience in the automobile sales business, learned of this desire and interested certain individuals, referred to in the record as the "Parriott group," none of whom were experienced in that business, in a proposition to finance the purchase of the assets and business of the Mid-West Company. The result was that the Parriott group, including plaintiff, agreed

to and did subscribe for $50,000 (5,000 shares) of stock in the proposed new corporation. Winchell and Hayes each agreed to subscribe for $5,000 (500 shares) of stock in the new corporation. To that end, a corporation was organized as above stated. The Parriott group was composed of F. B. Parriott, his wife Kathleen C. Parriott, J. S. Hanlon, secretary to Mr. Parriott, E. D. Robinson, a business associate of F. B. Parriott, and the plaintiff, J. C. Adams, an attorney who had been associated with F. B. Parriott in business and in a professional capacity. When the new corporation was organized, the books of the corporation showed ownership of 5,000 shares of Class A stock as follows:

| F. B. Parriott | 33 Shares |
| Kathleen C. Parriott | 3,300 Shares |
| J. S. Hanlon | 833 Shares |
| E. D. Robinson | 417 Shares |
| J. C. Adams | 417 Shares |
| and of Class B stock: | |
| D. B. Winchell | 500 Shares |
| Hal Hayes | 500 Shares |

The subscription agreement of Winchell and Hayes gave each an option to purchase 1,500 additional shares of Class B stock at par at any time within three years from the date of the original subscription. The first board of directors, five in number, consisted of Winchell, Hayes, Robinson, Hanlon, and H. A. Zellman, Mr. Parriott's secretary. Class A and Class B stock had equal voting power. Thus the Parriott group had voting control of the corporation. At the first meeting of the board, held January 21, 1931, Winchell was elected president, Hayes vice president, and Hanlon vice president and treasurer.

Winchell and Hayes were unable to pay for the stock subscribed by them, without borrowing the money. They each borrowed $5,000 from the Mid-West Chevrolet Company, from which the business had been bought, and each gave his promissory note therefor and agreed to pledge as security his shares of stock in the new corporation. There was restriction against the pledge of the

stock as security for the stockholders' indebtedness and the Mid-West Company declined to accept the stock as a pledge without waiver by the Mid-West Corporation of the restriction against its pledge. Thereupon the corporation, by its board of directors, waived the restriction and the stock was pledged as security for the loans. Winchell was made general manager at a salary of $400 per month. Later Hayes, being unable or unwilling to pay his note, the corporation assumed and later paid the same and his stock was surrendered to the corporation and Hayes dropped out of the corporation. F. B. Parriott was elected director in his place.

When Winchell's note to the Mid-West Company became due, he borrowed from the First National Bank & Trust Company $5,000 and paid his note to the Mid-West Company. The note to said bank was later paid in full. The manner in which it was paid gave rise to one of the controversies in this case.

In December, 1933, plaintiff was elected to the board of directors and served as such until February, 1939.

About January, 1934, just before Winchell's option to purchase 1,500 additional shares of Class B stock was to expire, at the suggestion of F. B. Parriott, Winchell exercised his option to the extent of the purchase of 875 additional shares of Class B stock. For some reason, not made clear, the corporation, through the officers then in control, determined that the total outstanding stock of the corporation should not be increased by the purchase of additional stock by Winchell. Thereupon it was decided that the then owners of the 5,000 shares of Class A stock should sell back to the corporation the same number of Class A shares, at par, each holder of Class A stock to sell to the corporation his proportionate number of shares of Class A stock. This was done, and as a result, plaintiff sold back to the corporation 73 shares of his Class A stock and the other holders of Class A stock did likewise as to their propor-

tionate shares, and the outstanding Class A stock was reduced by 875 shares, while the outstanding Class B stock was increased by 875 shares. This made Winchell the owner of 1,375 shares of Class B stock, and the Parriott group then owned 4,125 shares of Class A stock. This transaction and the manner in which it was carried out gave rise to other matters in controversy in this action.

About the same time, Winchell's salary as manager was increased from $400 per month to $1,000 per month. At or about the same time the board of directors authorized the payment to plaintiff of $62.50 per month as attorney's retainer.

About January, 1939, defendant Winchell entered into a contract for the purchase, at par, of the 2,750 shares of Class A stock then held by F. B. Parriott and his wife, and to pay the purchase price, $27,750, in monthly installments of $458.33 each plus interest on the unpaid balance. The certificates were assigned to Winchell and the 2,750 shares of Class A stock were transferred to him on the books of the corporation. The contract of purchase and the shares of stock were placed in escrow in the First National Bank & Trust Company of Tulsa. Winchell authorized the bank to pay the monthly installments and interest and charge the same to his personal checking account. The contract of purchase between the Parriotts and Winchell provided that as one of the considerations of the agreement and as one of the considerations in arriving at the purchase price of said stock, Winchell, having controlling interest in the corporation, would pay or cause to be paid to E. D. Robinson a sum not less than $200 per month as salary, dividends, or otherwise, for three years and until Winchell had fully paid his note to Mrs. Parriott or until release in writing by Parriott. That transaction and the manner in which it was carried out gave rise to several items in controversy in this action.

In 1939, at the first meeting of the stockholders after the 2,750 Parriott shares were transferred to Winchell, the board of directors was reduced in number from five to three and the directors elected at that time were Winchell, John E. Byers, and Roy F. Godfrey. Adams and Robinson, then the only stockholders other than Winchell, were not elected. At the first meeting of the board of directors thereafter Winchell's salary as general manager was increased from $1,000 to $1,500 per month. At various times while Winchell was general manager of the corporation checks were drawn against the funds of the corporation and applied to various debts or obligations of Winchell, such as payments of his federal and state income taxes, life insurance premiums, and other private indebtedness. This gave rise to other matters here in controversy.

In December, 1939, 100 shares of Class B stock were voted and issued to defendant John E. Byers as a bonus, and in January, 1941, an additional 100 shares of such stock were voted and issued to Byers as a bonus. This transaction is also a matter of controversy.

Subsequent to January, 1941, cash bonuses were voted and paid to Byers, which plaintiff challenges as being illegal.

Plaintiff in his petition sets forth ten causes of action. The first cause of action seeks cancellation of the original 500 shares of Class B stock issued to Winchell in January, 1931, upon the alleged ground that Winchell was representing the proposed new corporation in selecting about 150 used cars which were purchased from the Mid-West Company and that he permitted the selection of the less salable cars by reason of the fact that he borrowed $5,000 with which to purchase his 500 shares of Class B stock from said Mid-West Company and that, as a result, the Mid-West Corporation lost $8,000 on the sale of said used cars, and upon the further alleged ground that defendant

Winchell used funds of the corporation to pay for his 500 shares of Class B stock.

In the second cause of action plaintiff seeks cancellation of the 875 shares of Class B stock issued to Winchell in January, 1934, upon the alleged ground that although Winchell borrowed the $8,750 with which to pay therefor, from the First National Bank & Trust Company, he used the credit of the Mid-West Corporation in securing said loan and that Winchell repaid said loan wholly out of dividends thereafter paid on his said shares of Class B stock and his other alleged void shares and by cash otherwise drawn from the corporate treasury without authority of law.

In the third cause of action, plaintiff seeks an accounting by defendant Winchell upon the ground that Winchell, in January, 1939, while holding of record in his name the 1,375 shares of Class B stock, being the only shares of that class then outstanding, obtained control of the corporation by the contract with Mrs. Parriott for the purchase of the 2,750 shares of Class A stock and having same transferred to his name, and while said stock was so held in escrow under said contract, drew dividends on the same in the sum of $5,850 on 900 shares of said stock which Winchell afterwards sold back to the corporation at the price he had contracted to pay Mrs. Parriott therefor, and that Winchell, immediately after obtaining control of the corporation, unlawfully caused his own salary to be increased $500 per month, which plaintiff alleged to be an unreasonable and excessive amount, and thus obtained part of the money with which to purchase the shares of stock which he still held.

In the fourth cause of action plaintiff seeks an accounting by Winchell for $31,000 alleged to have been withdrawn from the corporate treasury at various times between February 19, 1939, and July 31, 1943, and paid to Winchell without corporate authority.

By the fifth cause of action, plaintiff seeks an accounting by Winchell for the sum of $7,200 withdrawn from the corporate treasury and paid to E. D. Robinson at the rate of $200 per month beginning January, 1939, under his said contract with the Parriotts.

By the sixth cause of action, plaintiff seeks cancellation of the 1,850 shares of Class A stock held by Winchell, upon the ground that Winchell, being the president of the Mid-West Corporation and a member of its board of directors, should have purchased said shares of stock from Mrs. Parriott for the corporation instead of for his own account, and for the further alleged reason that said shares were in fact paid for by Winchell with money belonging to the corporation and wrongfully withdrawn from its treasury by and under the direction of Winchell.

In the seventh cause of action, plaintiff seeks an accounting by Winchell for money aggregating $11,750 alleged to have been withdrawn from the corporate treasury and used to pay Winchell's Federal and state income taxes. (At the trial, plaintiff withdrew from his cause of action any claim for money paid for or on account of Winchell's Federal income taxes.)

In the eighth cause of action, plaintiff seeks to have Winchell account to the corporation for many miscellaneous items paid by the corporation for Winchell's individual benefit, such as labor furnished for the upkeep and maintenance of his personal automobile, his residence, and traveling expenses.

In the ninth cause of action plaintiff seeks cancellation of the 200 shares of Class B stock issued to defendant Byers, and in support of his claim in this regard, pleads certain constitutional and statutory provisions of the State of Delaware.

In the tenth cause of action plaintiff seeks accounting by defendant Byers for the cash bonuses paid to him by the corporation.

Defendants, by answer, jointly and severally set up the following defenses to each of the several causes of action: First, a general denial; second, personal and actual knowledge of all the matters complained of by plaintiff constituting ratification and estoppel; third, laches; fourth, the statute of limitations.

Reply was by general denial.

Before the trial commenced, plaintiff requested that the court make special findings of fact and conclusions of law. After the evidence was all in, plaintiff presented and requested extended findings of fact and conclusions of law which were denied by the court. Thereupon, the court made and filed findings of fact and conclusions of law covering some 76 paragraphs, much too long to include in full herein. Many of plaintiff's requested findings of fact were concerning matters not in dispute and some of which were included in the findings made by the court. These were matters going to the details of the purchase of the assets of the Mid-West Company and the organization of the Mid-West Corporation.

Concerning the first cause of action, the trial court found that Winchell borrowed $5,000 from the Mid-West Company, from which certain properties and assets had been purchased for the benefit of the Mid-West Corporation, and that said $5,000 was paid to the Mid-West Corporation for Winchell's subscription for 500 shares of Class B stock; that no negotiations were had for said loan until after the agreement for the purchase of the assets of the Mid-West Company had been consummated; that said loan transaction was nothing other than the usual and customary loan transaction, secured by the pledge of the 500 shares of Class B stock, and that said loan was subsequently repaid by defendant Winchell from his own funds; that J. S. Hanlon was the agent of the Parriott group, of which he was a member, and that he had full knowledge at the time that Winchell was borrowing the $5,000 from the Mid-West

Company to pay for his 500 shares of Class B stock, and that the Mid-West Corporation, shortly after its formation, had full knowledge thereof and that plaintiff personally had knowledge thereof not later than the year 1933, or at least had knowledge of sufficient facts to put him on inquiry; that Winchell did not procure the $5,000 from money that was not his property nor did he procure the same by trading secretly in the property rights or credits of the corporation; that Winchell in his negotiations for the purchase of the assets of the Mid-West Company at all times acted in good faith and to the best of his judgment and ability and that he in no manner defrauded or attempted to defraud the purchaser.

The court concluded as a matter of law that Winchell was not guilty of any fraud or breach of any fiduciary obligation in connection with the purchase of the 500 shares of Class B stock and the said 500 shares are valid, outstanding shares of stock owned by defendant Winchell, and that plaintiff, on behalf of the corporation, is not entitled to have said shares canceled. The court further concluded that the first cause of action was without merit, and if there had been merit therein, the same is barred by the statute of limitations.

We deem it unnecessary to discuss in detail the evidence touching the first cause of action. Sufficient to say that the findings of fact and conclusions both as to the merits of said cause and the statute of limitations are not clearly against the weight of the evidence but are in full accord with the evidence. It is true that some of the checks going to pay Winchell's note were drawn against the corporate funds, but the evidence fully discloses that the money was either due Winchell on his salary or on dividends.

In this connection, it may be noted that the evidence does show the corporation lost $8,000 on the sale of used automobiles during the year 1931, but it does not show that this loss was sustained on the used automobiles purchased from the Mid-West Company alone. There is evidence to the effect that Winchell made the statement that the corporation lost $8,000 on the sale of the used automobiles purchased from the Mid-West Company. But the records of the corporation show that the corporation sold about 1,500 used automobiles during the year 1931 and that the $8,000 loss was incurred on the sale of all the used automobiles. There is also evidence to the effect that all automobile dealers expect to and did lose money on the sale of used cars. It is a matter of common knowledge that such dealers in ordinary times, when competition is keen, customarily take used automobiles in in trade at prices higher than they expect to or are able to resell the same.

The trial court made findings of fact and conclusions of law exonerating Winchell concerning the matters involved in the second cause of action, growing out of Winchell's purchase of 875 shares of Class B stock in January, 1934, and the manner in which it was paid for, and also found and held that the second cause of action was without merit and barred by the statute of limitations. These findings of fact and conclusions of law are likewise not clearly against the weight of the evidence. The court found, and the evidence fully discloses, that Winchell's original stock subscription gave him a three-year option to purchase 1,500 additional shares of Class B stock; that the option was to expire the latter part of January, 1934; that late in 1933, Mr. Parriott, who then together with his wife owned a majority of all outstanding stock in the corporation, suggested that Winchell should purchase some additional stock. It was not suggested by Winchell, who advised Parriott that he did not have the cash available to purchase the 1,500 additional shares; that Parriott worked out the plan; it was decided that Winchell should purchase 875 shares instead of 1,500 shares; the stockholders then in control of the corporation deemed it

inadvisable to increase the outstanding capital stock of the corporation. It was then mutually agreed that the corporation would buy back 875 shares of Class A stock and sell Winchell 875 shares of Class B stock at par. Arrangements were made with the First National Bank & Trust Company for Winchell to borrow $8,750. All the Class A stockholders, including plaintiff Adams, agreed to and did sell back to the corporation, for cancellation, 875 shares of Class A stock at par, each holder selling his proportionate number or shares. Winchell borrowed from the bank the $8,750 to pay for his additional purchase. The board of directors, controlled by the Parriott group, caused the corporation to endorse Winchell's note at the bank. The $8,750 was paid to the corporation and apparently the same $8,750 was used by the corporation to pay for the 875 shares of stock sold back to the corporation by the class A stockholders. Plaintiff's contribution to this transaction was 73 shares which he sold to the corporation and received therefor $730.

This was all done apparently in pursuance of an original plan or understanding that Winchell would eventually purchase or acquire one-fourth of the capital stock, when Winchell and Hayes were given the options to purchase 1,500 additional shares. Hayes had dropped out and the corporation had taken up his 500 shares of Class B stock. When the transaction was completed, Winchell was the owner of 1,375 shares of Class B stock, substantially one-fourth of the outstanding stock of the corporation. Apparently it was well understood by all concerned, since about the same time Winchell's salary as manager was increased from $400 per month to $1,000 per month; this by a board of directors the majority of whom were of the Parriott group and including plaintiff J. C. Adams.

The court found, and the evidence shows, that Winchell's indebtedness to the bank, after having been renewed and extended from time to time, was paid by Winchell out of funds coming to him either as salary or dividends.

The court found, and the evidence showed, that the corporation never suffered any loss because of this transaction or by the endorsement of Winchell's note, and that the corporation was later fully released from all liability on account of Winchell's personal liability.

During all that time plaintiff Adams was a member of the board of directors of the corporation, acting as its counsel, and drawing $62.50 per month retainer. At the annual meeting of stockholders February 14, 1934, the action of the directors in authorizing the sale of 875 shares of Class B stock to Winchell and the repurchase of the 875 shares of Class A stock and all matters connected therewith were specifically approved and ratified. At that stockholders' meeting all the outstanding stock of the corporation was represented, either by the holders thereof in person or by proxy, and no shareholder voted against the approval and ratification.

In view of the fact that plaintiff agreed to and did sell back to the corporation 73 shares of his Class A stock, in pursuance of and in carrying out the plan, it could hardly be said that plaintiff knew nothing about the transaction. It is true, as shown by the cases cited by plaintiff, that the directors of the Mid-West Corporation were without power to authorize the corporation to endorse Winchell's note to the bank and that the corporation could not lend its credit to Winchell or any of its directors. But the same authorities hold that where the lender had knowledge that the corporation's credit was being used, as did the bank in the instant case, the bank, as lender, could not enforce any liability against the corporation. 19 C.J. S. 135; Waters et al. v. Disbrow & Co. et al., 70 Fed. 2d 572; McKenney, Rec'r, v. Campbell et al., 104 Okla. 182, 230 P. 228. The corporation, never having been liable on Winchell's note and having received full value for the stock,

cannot be heard to say that Winchell is not the owner of the stock or that it was purchased with its money. Under the record, the finding, conclusion, and judgment of the trial court in respect to the second cause of action are not contrary to the clear weight of the evidence.

With respect to the sixth cause of action presented by plaintiff under its third proposition, the court found, and the evidence shows, that on or about January 3, 1939, 2,750 shares of Class A stock were transferred on the corporation's books to defendant Winchell, pursuant to an assignment of said stock from Mrs. Parriott to Winchell; that by this transfer, Winchell became the record owner of a majority of both classes of the then issued and outstanding stock of the corporation; that this transfer was duly made by the authorization of the record owner of said stock, pursuant to the written contract between the Parriotts and Winchell for the sale and purchase thereof; that said contract set forth a consideration of $10 per share, or a total consideration of $27,500, payable in installments of $458.33 per month plus interest upon the unpaid balance; that Mr. Parriott contacted Winchell and suggested that he was willing to sell said stock to Winchell at par and upon favorable terms, and that this offer was made because of personal reasons of the Parriotts, one of which was that Mr. Parriott felt that Winchell's personal efforts in the management of the corporation had resulted in the Parriotts' investment in the corporation having been very profitable and that Mr. Parriott felt that Winchell was entitled to a larger ownership in the corporation; that the Parriott stock could not have been purchased by the corporation or anyone other than Winchell at said price and upon those terms; that the opportunity to purchase said stock came to defendant Winchell in his individual capacity and not in his official capacity as an officer or director of the corporation, and the purchase of said stock was not essential to the company's business, and that defendant Winchell paid for said stock with his own funds or money and not with corporate funds.

Plaintiff asserts that Winchell, being president and director of the corporation, owed the duty to make the opportunity to purchase the Parriott stock available to the corporation, and violated his duty by failure to disclose to the corporation that said stock could be purchased at the price and upon the terms offered to him, in that the corporation was authorized under the laws of Delaware to purchase its capital stock and the corporation's charter contemplated that its stock might be purchased by the corporation.

In this connection, plaintiff cites Farwell v. Pyle-National Electric Headlight Co., 289 Ill. 157, 124 N. E. 449; Bilby v. Morton, 119 Okla. 15, 247 P. 384; Phelan v. Roberts, 182 Okla. 202, 77 P. 2d 9; Loft, Inc., v. Guth, 23 Ch. 138 (Del.) 2 Atl. 2d 225; and other similar cases.

The Farwell Case, supra, did not involve purchase of stock of the corporation. It involved the purchase of a patent royalty contract, a property interest and valuable to the corporation in the conduct of its business. The same is true in Bilby v. Morton, supra. Phelan v. Roberts, supra, merely cites the Farwell Case on the question of laches. It has no application to the question here involved. Other cases cited go only to the purchase individually by an officer of a corporation of property essential to the corporation in the transaction of its business and which should have been purchased by the corporation.

The general rule is that officers and directors in control of a corporation occupy toward the corporation and its stockholders, in respect to the business or property of the corporation, a fiduciary relation somewhat in the nature of trusteeship and cannot deal with the property of the corporation for their own personal benefit or advantage. But this duty does not extend to the outstanding stock of the corporation for

the reason that such stock is the individual property of the respective stockholders and not in any sense- the corporation's property. The corporation, as such, has no interest in the outstanding stock or in dealings among the stockholders with respect thereto unless restricted by charter or by-laws of the corporation. Bisbee v. Midland Linseed Products Co., 19 Fed. 2d 24; Keely v. Black, 91 N. J. Eq. 520 111 Atl. 22.

In Chenery Corporation v. Securities & Exch. Com., 128 Fed. 2d 303, it is held: "Under Delaware laws, the purchase of shares of stock in a corporation by a director is entirely legal and proper". The sale was not of property or a commodity essential to the corporation in its business. Had it been so, the Loft-Guth Case cited by plaintiff would be highly persuasive.

F. B. Parriott was a witness and testified, in substance, that it· was he who first suggested the sale of the Parriott stock to Winchell; that he did so because he felt that Winchell and his immediate group had made the business and had been very successful; that he would not have made the offer to the corporation because he thought he could have sold the stock for more to other people had he gone out to look for a market and that he would not have sold the stock to any other stockholder at that price. Furthermore, under the laws of Delaware, the corporation could use only its surplus earnings to buy in its capital stock. At the time the sale was made to Winchell, the corporation had a surplus of less than $16,000, or about $11,500 less than the purchase price of the Parriott stock.

· Mr. Parriott testified that at the time the contract of sale to Winchell was made, he informed both Adams and Robertson, the only other stockholders, of the facts of the sale. At that time plaintiff was a director of the corporation and· it does not appear· that he raised any objection to the sale at that time, which was January, 1939, more than four years before this action was commenced.

The trial court specifically found and held that the sixth cause of action was barred by. the two-year statute of limitations. The findings, conclusion, and judgment of the trial court as to the sixth cause of action are not clearly against the weight of the evidence.

Under the fourth proposition, plaintiff contends that Winchell used his dominant position in the corporation to secure the use of capital money to pay for the Parriott stock;· that said ·stock was in fact paid for with corporate money. To sustain that contention, plaintiff points out that at the first meeting of stockholders after Winchell acquired the Parriott stock, which gave him a majority of all the outstanding stock, the board of directors was ·reduced in number from five to three and plaintiff was left off the board by the vote of Winchell's stock, and Byers and Godfrey, neither of whom at that time owned any stock in the corporation, were, together with Winchell, elected as the only directors, and at the first meeting of directors thereafter Winchell's salary, as manager, was increased from $1,000 to $1,500 per month, and Byers' salary was fixed at $360 per month, and that this increase of Winchell's salary enabled Winchell to pay for the stock at $458.33 per month.

The contention is that a salary of $18,000 per year was and is excessive and that a lawful quorum of the board of directors was. not present when the salary was increased. With reference to the election of Byers and Godfrey, non-owners of stock, it is conceded that under the laws of Delaware, under which the corporation was organized, a director need not be a stockholder. Incidentally, it may be noted that Byers' salary was not increased. It was fixed at the same sum he had been drawing for years.

The court found, and the evidence shows, that the by-laws of the corporation then provided, and now provide, that nothing therein contained shall preclude any director from serving the cor-

poration in any other capacity and "receiving compensation therefor in any amount fixed by the board of directors with full membership present and acting". The record shows that a full membership of the board was present and acting at the time Winchell's salary was increased from $1,000 to $1,500 per month, so that in form the salary increase was lawfully made.

. The court found, and the uncontradicted evidence shows, that at the annual meeting of stockholders, held February 14, 1939, the number of directors was reduced from five to three by amendment to the by-laws, and at that meeting, Winchell, Byers, and Godfrey were elected directors of the corporation by the unanimous vote of all stockholders, including plaintiff J. C. Adams. The record shows that plaintiff was present in person and cast the vote of his 344 shares for the election of Winchell, Byers, and Godfrey as directors. There can be no doubt as to the validity of the amendment of the by-laws and the election of Winchell, Byers, and Godfrey.

The court also found that the salary of $1,500 per month so authorized by the board of directors to be paid to Winchell, as president and general manager, is and has been a fair and reasonable salary for the services rendered, and is not and has not been excessive.

On the question of reasonableness of this salary, the evidence is in conflict. One or two witnesses for plaintiff testified that in their opinions said salary is and was excessive. Mr. Parriott, a man of much experience in business affairs, who was a director of the corporation for several years, testified that in his opinion a reasonable salary for Mr. Winchell would be from $15,000 to $25,000 per year. E. F. Hayes, zone manager for Chevrolet Division of General Motors Corporation, a man of long experience in the business and well acquainted with business of the corporation, testified that in his opinion a

reasonable salary for Mr. Winchell would be $20,000 to $25,000 per year. C. C. Brand, manager of Fred Jones, Ford dealer in Tulsa, a similar business to that of the Mid-West Corporation, testified that in his opinion a fair compensation for Winchell would be $25,000 to $30,000 per year, and on cross-examination, testified that he, himself, when he came to Tulsa as manager of the Ford agency, was paid $20,000 per year as manager for such agency. J. J. Breen, manager of General Motors Acceptance Corporation, familiar with automobile business generally and with salaries paid to managers thereof, testified that in his opinion a fair salary would be from $20,000 to $25,000 per year.

The findings of the trial court as to the reasonableness of Winchell's salary are not clearly against the weight of the evidence. The contention that the increase is void as excessive cannot be sustained.

However, plaintiff contends further that the resolution increasing Winchell's salary was void because no legal quorum of the board of directors was present at the time the resolution was adopted. In this connection, plaintiff asserts in his brief that the resolution was adopted by the affirmative votes of Winchell and Byers. The record does not bear him out in this assertion. The minutes of the meeting show:

". . . the following members being present: D. B. Winchell, John E. Byers, Roy F. Godfrey. . . . Upon motion duly made, seconded and carried, it was resolved, that beginning January 1, 1939, monthly salaries be paid as follows:

D. B. Winchell, President    $1,500.00
John E. Byers, Vice President   360.00
S. E. Vogelhut, Assistant
    Sec'y and Treasurer         163.35

the said salaries subject to change at any time upon action of the Board of Directors."

This shows full membership of the board was present. It does not show that the resolution was adopted by the

affirmative vote of Winchell and Byers alone. It does not show how each individual member voted. The resolution did not increase Byers' salary. $360 per month had been his salary for years. Winchell was the only officer whose salary was increased by the resolution. All the record shows is that the motion to adopt the resolution was carried. It may have been by the affirmative vote of Byers and Godfrey; it may have been by the affirmative vote of all three. Certainly, it does not show that only Winchell and Byers voted for the resolution.

The further contention is that the increase in Winchell's salary was void because no legal quorum of the board of directors was present at the time the resolution was adopted. The general rule is that it is within the power of the board of directors to fix the salaries of officers employed by them, though from their own number, unless there is some provision in the statute, charter, or by-laws limiting or prohibiting the exercise of such power. Fletcher, Cyc. Corporations, vol. 5, p. 414. In this case the by-laws give express power to the board of directors to employ one of its members as general manager and fix his compensation. The only limitation upon this power is that in fixing the amount of compensation, the full membership of the board must be present and acting.

It is also the general rule that a director cannot vote on a resolution fixing his own salary or compensation as the incumbent of another office or for services to be performed by him aside from the duties of his office as director even though the by-laws of the corporation authorize the board of directors to elect the officers and fix their salaries. Fletcher, Cyc., Corporations, vol. 5, pp. 419-420.

In 19 C.J.S. p. 199, it is said that directors are precluded from fixing, increasing, or voting compensation for themselves as directors or officers unless they are expressly authorized to do so by the charter or by the stockholders. This rule is apparently limited to fixing salaries of directors and officers as such and does not in all cases extend to fixing compensation for agents and managers who perform duties and render services outside of their duties as directors or officers. It has been held that where a director claims compensation for his services, being disqualified from voting on the question, if his presence is necessary to make a quorum of the board, or if his vote is necessary to the result, the resolution will be void or voidable; but where his vote is not necessary to the adoption of such resolution, it will not necessarily be void, although he may have voted for it, or although he may have been present when the vote was taken. 19 C.J.S. pp. 199-200.

Also, under the general rule as to voting, it has been held in many cases that the vote of an interested director cannot be counted for the purpose of ascertaining if a quorum is present; but there are authorities to the contrary. Fletcher, Cyc. Corporations, vol. 5, pp. 423-424.

In Gumaer v. Cripple Creek Tunnel, Transportation & Mining Co. et al., 40 Colo. 1, 90 P. 81, it is held:

"Where a corporation's board of directors consisted of five members, and the corporation's by-laws required four to constitute a quorum, a majority of the quorum, being a majority of the board, was authorized to pass a resolution for the benefit of the president, who was a member of the board, but did not participate in the vote on such resolution."

Again it is said that a resolution of the board of directors fixing the salary of a director as the incumbent of another office is not invalid merely because such other director voted if there were enough votes without him to constitute a majority of the board, or if the board, without his participation, has subsequently ratified the resolution by a majority vote or where the corporation is practically a one-man company, thus making it necessary for the interested director to vote on his own contract.

Fletcher, Cyc., Corporations, vol. 5, pp. 424-425.

In re American Range Foundry Co., 22 Fed. 2d 558, holds:

"Fact that director, who with his son substantially owned corporation, entered into a contract with corporation for his own services, was not of itself sufficient to avoid the contract."

In Funsten v. Funsten Commission Co,. 67 Mo. App. 599, it is held that where three directors of a corporation, by unanimous vote, fixed the salary of one of their number as president and another as secretary, the resolution was valid as to the salary of each officer if it was supported by two disinterested votes. However, it is said that these decisions are opposed to the weight of authority and that the courts will not separate a resolution into parts and hold it valid on the gorund that each part was carried by a majority vote of the other directors not interested in that particular portion. Fletcher, Cyc., Corporations, vol. 5, pp. 425-426, citing cases. It thus appears that there is great diversity of opinion on the question of whether a director of a corporation may be counted as present in order to constitute a quorum of the board of directors to vote upon the compensation of such director who is employed as manager or other representative of the corporation to perform duties or render services outside of his ordinary duties as a director.

In none of the cases cited, or which we have been able to find, was there a provision in the by-laws on the subject, like or similar to the provision of the by-laws of the Mid-West Chevrolet Corporation. If the interested director cannot be counted present in order to constitute a quorum of the board of directors in fixing his compensation as general manager, or other agent or representative of the corporation employed to perform duties or render services outside of his ordinary duties as director, there is no way by which a director may be employed for compensation to perform such duties or render such serv-

ices. The by-laws always provided that "Nothing in these by-laws contained shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor in any amount fixed by the board of directors with full membership present and acting". This was doubtlessly intended to and did authorize the board of directors to employ one of its members as general manager or in any other capacity to render services other than his ordinary duties as director and to fix his compensation therefor. But it also required that in fixing such compensation, full membership of the board must be present and acting, and this is true whether the board consists of three, five, or more members. Therefore, his compensation could not be fixed without his presence. He must be counted present in order to authorize the board to act on the question; otherwise, his compensation could not be fixed in any amount and the by-laws would be entirely inoperative. Not only must he be present, but he must "act". Does this mean he must act on the question of fixing the amount of his own compensation for performing duties or rendering services outside his duties as director? We think it does, for the by-laws say so in so many words. If he must act, can he vote in favor of a resolution fixing such compensation? The by-laws say that he must be present and acting. This clearly means that he is free to act either for or against a resolution fixing such compensation. If this were not true, no compensation paid to Winchell or other directors after January, 1934, was valid.

The minutes of the directors' meeting, January 19, 1934, show directors present, F. B. Parriott, D. B. Winchell, E. D. Robinson, and H. A. Zellman. J. C. Adams was absent. At that meeting a resolution was adopted fixing the salaries of D. B. Winchell, F. B. Parriott, H. A. Zollman, E. D. Robinson, and J. C. Adams. Thereby the compensation of plaintiff, J. C. Adams, attorney, was fixed at $62.50 per month. All of the directors present were interested in the resolution. If the contention of plain-

tiff is sound, then none of the salaries paid to the directors, including plaintiff J. C. Adams, were legally paid.

That resolution is more subject to condemnation than the one here under consideration for the reason that all of the members of the board of directors were not present and acting at the time the same was adopted. We hold that under the particular provision of the by-laws of this corporation, each member of the board of directors was required to be present and was authorized to vote on the question of fixing his compensation for services rendered outside of his ordinary duties as director.

Plaintiff's seventh proposition is that the resolution increasing Winchell's salary was void because a majority of the board of directors which adopted the resolution were disqualified to vote thereon. What we have said concerning the sixth proposition is applicable and determines the seventh proposition against plaintiff's contention.

Plaintiff's eighth proposition is that certain funds of the corporation alleged to have been wrongfully appropriated by Winchell did not lose their trust character and the stock purchased therewith by Winchell may be impressed with a trust in his hands. This proposition goes to that part of the record which shows that in addition to the salary of $1,500 per month paid to Winchell after February 14, 1939, he drew $250 per month, aggregating $14,000. This money was charged to Winchell's account on the books of the corporation. Checks for the $250 per month were drawn by the corporation, payable to Winchell, and deposited in his personal account in the bank, and later charged to that account in payment on the Parriott contract for the purchase of the 2,750 shares of stock sold by the Parriotts to Winchell. The record shows that all of the $14,000 so drawn was eventually repaid to the corporation by being charged to dividends accruing from time to time on the stock held by Winchell. Both certified accountants who were witnesses so testified.

Plaintiff apparently contends that Winchell should be charged with having bought the stock as trustee for the corporation. Plaintiff cites many authorities to the effect that a trustee may commit breach of trust by misappropriation of trust funds and using them in purchasing property for himself, citing Scott on Trusts (1939 Ed.) sec. 210, p. 1120; Pomeroy's Equity Juris., vol. 4 (5th Ed.) secs. 1051 and 1058 to 1058d, inclusive; and he also cites decisions of various courts sustaining the text.

These authorities are applicable where the trustee or other officer of the corporation takes money belonging to the corporation and therewith purchases, in his own name, property essential for the business of the corporation which he serves or buys in his own name, property of the corporation. In either case, the corporation may elect to compel the return of the money so wrongfully appropriated, with interest, or require holding the property subject to the trust, i. e., for the benefit of the corporation. But the corporation cannot compel the return of the money and also claim the property so purchased, and where the money so taken has been fully repaid, the corporation cannot retain the money and at the same time secure the property so purchased.

The stock purchased by Winchell was not property of the corporation; neither was it property essential to the corporation in the operation of its business. It was the individual property of the Parriotts, which Winchell was at liberty to buy on his own account. True, he had no right to withdraw money from the corporation against future dividends, and should be required to repay all money withdrawn against dividends before such dividends were actually declared. The court found that all of the withdrawals had been repaid to the corporation at the time of the trial, by crediting dividends and other credits accruing to Winchell from time to time against said withdrawals, and all of such transactions were promptly recorded on the corporate books.

The evidence sustained this finding, with slight exception. Two certified accountants were witnesses, one for plaintiff and one for defendants, and they agree that all of said withdrawals had been repaid and that the books so show, with the exception of about $3,800. Mr. Godfrey, one of the accountants, testified that at the date of the trial there had accrued credits in Winchell's favor on the books of the corporation in a sum sufficient to discharge this balance due and that the reason such credit had not been made was because of the injunction obtained by plaintiff in this action.

The contention of plaintiff that Winchell holds any part of the Parriott stock in trust for the corporation cannot be sustained. However, Winchell should be charged with interest on all money withdrawn by him against future dividends or future accruals of salary from the time the money was withdrawn until dividends were actually declared or salary was actually earned and due. The matter of such interest and the court's judgment with reference thereto will be later discussed herein.

Plaintiff's ninth proposition is that in the contract between Winchell and Mrs. Parriott for the purchase of the Parriott stock, Winchell, as a part of the consideration of the agreement and in arriving at the purchase price, agreed that, having controlling interest and stock, he would pay, or cause to be paid, to E. D. Robinson $200 per month for three years, whether paid as salary or dividends; that Robinson was paid $200 per month for the three years; and that the $7,200 so paid should be charged to Winchell. The contention is not tenable. The evidence shows that Mr. Parriott, being a friend and an associate of Robinson, wanted to be sure that Robinson, who at the time was in somewhat straightened circumstances, would be able to draw from the corporation $2,400 per year in dividends or salary of some kind and that this should be paid monthly at the rate of $200 instead of waiting until dividends would accrue.

The effect of the contract is no more than that Winchell would pay Robinson whatever amount the dividends on Robinson's stock would fail to produce $2,400 per year. Robinson at that time owned 1,031 shares of Class A stock. Dividends accruing to said stock between the time Winchell made the contract with Parriotts and the time Robinson sold his stock were sufficient to pay the $200 per month during the entire time, and $17 more. All the $7,200 so paid to Robinson during the three years was charged against his dividends as they accrued from time to time. Under the record, no part of the principal of the $7,200 is chargeable to Winchell. However, the record does disclose that the $200 per month paid to Robinson during the three years was withdrawn from time to time when there were no dividends due and payable on his stock. For this, the corporation was entitled to interest, and Winchell, under his contract, should be charged with such interest. That is another item of interest later to be discussed.

Under the tenth proposition, plaintiff contends that the corporation is entitled to have an accounting from Winchell respecting his use of corporate money to discharge his personal income taxes, insurance premiums, and other miscellaneous items of personal expense. With this, we agree. But again the court found, and the evidence shows, that all these items had likewise been repaid in full out of Winchell's dividends and salary. The testimony of the two certified accountants agrees that this is true. The corporation has been fully reimbursed for the principal of the money so advanced. But Winchell has not paid, and has not been charged with, any interest on the money so used. Interest, therefore, is a proper charge against him for the use of the money until repaid. This is another item of interest which will be later discussed.

Under the eleventh proposition, plaintiff contends that the 100 shares of stock issued to John E. Byers in December, 1939 and the 100 shares issued to him in January, 1941, should be canceled.

The record shows that on December 15, 1939, the board of directors, at a regular meeting, adopted a resolution authorizing the issuance of 220 shares of stock to its key employees, the same to be considered as a bonus for services rendered. In pursuance of said authorization, 100 shares of stock were issued to Byers. On January 2, 1941, at a regular meeting of the board, the matter of paying the bonus to certain key employees was up for discussion, resulting in the unanimous adoption of a resolution directing the issuance of 100 shares of stock to John E. Byers, and 20 shares each to two other employees, 15 shares each to three other employees, 10 shares to one other employee, and 5 shares each to four other employees.

Plaintiff assails the issuance of the bonus stock to Byers, but does not question the issuance of such stock to the other employees. It is contended that the issuance of the stock to Byers was in violation of a constitutional provision of the State of Delaware: "No corporation shall issue stock except for money paid, labor done, or personal property, or real estate, or leases thereof, actually acquired by such corporation".

The authorization for the issuance of the first 100 shares of stock to Byers specifically states that it was for services rendered. The authorization for the issuance of the second 100 shares states that it was authorized to be issued to certain employees, including Byers. The minutes of the meeting disclose that in the discussion leading to the authorization, they were referred to as "key employees".

As between employer and employee, a bonus is defined, in Kenicott v. Wayne County (Ill.) 16 Wall. 452, 470, 21 L. Ed. 319, as follows:

"A bonus is not a gift or gratuity, but a sum paid for services, or upon a consideration in addition to or in excess of that which would ordinarily be given."

The authority of directors to allow a bonus to its employees has long been recognized. It was said as long ago as 1925, in Putnam v. Juvenile Shoe Corp., 307 Mo. 74, 269 S.W. 593, 40 A.L.R. 1412, that: "In one form or another, the practice is hoary with age". In the same case, it was said:

"The payment of a bonus, when appropriately authorized, is not in itself a fraud upon dissenting stockholders. The practice has become common among large employers, and tends to stimulate loyalty, faithfulness, activity, and energy in employees, and gives them a real interest in the business of the employer beyond the extent of such qualities reasonably to be expected where a definite and unfluctuating compensation is all such employees have the right to anticipate."

The annotator, 40 A.L.R. 1424, says:

"No case has been found in which the granting of a bonus to employees has been held to be beyond the powers of a going, solvent corporation, provided the proper formalities were complied with, and the cases holding that the promise of a bonus is enforceable by an employee, set out in the annotation in 28 A. L. R. 331 and 346 sustain, by implication at least, so far as they relate to corporate employers, the view that such a grant is not ultra vires."

No case has been cited, and we have found none, holding to the contrary. The only limitation appears to be that the allowance must not be unreasonable and must be in proper relation to the value of the services rendered.

Plaintiff cites cases which for the most part apply to allowances and payment of bonuses to directors as such, where it was shown that the services rendered were not beyond or in addition to their ordinary duties as director. McCulloch v. Perry, 150 Okla. 203, 1 P. 2d 170, cited by plaintiff, is clearly distinguishable. In that case there was no resolution of the board of directors and no other agreement that McCulloch should receive compensation for his services. Plaintiff asserts that since Byers was a director, the rule should apply to him.

The record shows that Byers was an

employee of the corporation as assistant manager for many years before he became a director. After he became a director he was vice president and assistant general manager. He was manager of the repair and service department of the corporation and rendered valuable services as such. That was beyond his duties as a mere director. The trial court found:

"Bonuses in cash were paid to certain officers and employees pursuant to resolutions of the board of directors adopted during the years 1941, 1942 and 1943. These resolutions were duly passed by the board of directors with full membership present and acting and said bonuses constituted compensation to said officers and employees for services rendered by each of them to the corporation in some capacity other than in the capacity of a director of the corporation. The amounts of such bonuses were reasonable."

This finding of fact is abundantly sustained by the evidence and in no sense can it be said that it is clearly contrary to the weight of the evidence. This also applies to the cash bonus as well as the stock bonuses paid to Byers.

What we have said with reference to the eleventh proposition applies to and is decisive of appellant's twelfth proposition, which concerns the legality of the cash bonuses paid to Winchell and Byers.

We have stated above that Winchell should be charged with interest on money advanced to him before it was due. In this connection, the trial court found:

"Interest has not been computed on the advancements made by the corporation to E. D. Robinson and to the defendant, D. B. Winchell. To compute such interest would require an extensive audit of these accounts, involving computation on each item from the date of the advancement until the date of its repayment. The expense of such an audit would more than offset any advantage to be gained by the corporation thereby. The advancements have been ratified by all the stockholders, except the plaintiff, J. C. Adams. The advancements were made with no intent to charge or collect interest thereon."

There is no evidence as to what would be the cost of such an audit, but the record in this case contains nearly 1,700 pages, over half of which are exhibits. The items in question run into the hundreds, if not the thousands, which it would be necessary to check, not only the amount but calculate the time each item should draw interest. We are inclined to agree with the trial court on this finding.

As to the case as a whole, and particularly as to plaintiff's claim for cancellation of the stock held by Winchell and Byers, and bearing on the equities of the case, it may be well to say that in our judgment the plaintiff is without equities demanding relief. As found by the trial court, all the matters complained of involved questions with reference to internal management of the corporation's affairs. These are matters with which the courts are slow to interfere. Here we have a corporation organized and commencing business in January, 1931, the early days of the dark years of depression. It did comparatively little business at the beginning. Winchell gave up employment in which he was earning from $8,000 to $9,000 per year to take the management of the corporation at a salary of $400 per month, or about one-half of his previous earnings. The business, under his management with the assistance of Byers, prospered from the beginning. From 1931 to 1943, during only two years did the corporation fail to pay a substantial dividend. During that time the corporation paid in dividends the total sum of $78,952.50 and accumulated a surplus, as of September 30, 1943, of $49,786.60. The dividends paid during that time amounted to more than two and one-half times the par value of the stock, and the stock is shown to have a book value of $22.50 per share.

Plaintiff seeks cancellation of all the outstanding shares of stock, except the

344 shares held by himself and 115 shares held by minor employees. All the outstanding shares aggregate 3,884, which, at book value of $22.50 per share, have a value of $87,390. To cancel all the Winchell and Byers stock. as sought by plaintiff, would leave outstanding 344 shares held by plaintiff and 115 shares held by minor employees, or 459 shares. That would increase the book value of the stock to approximately $190.19 per share, or an increase of about $167.69 per share. The result would be to increase the book value of plaintiff's 344 shares from $7,740 to about $84,254.17, and increase book value to plaintiff in the sum of about $76,514.17; and in addition, plaintiff would become the majority stockholder and would thereby gain control of the corporation. This would leave Winchell and Byers about where they commenced and about 16 years of experience. Equity would hardly approve such a result. True, the record shows many irregularities in keeping corporate records and a somewhat loose system of bookkeeping. But, as found by the trial court, and as supported by the evidence, the corporation never lost a dollar thereby.

Affirmed.

GIBSON, C.J., HURST, V.C.J., and OSBORN, WELCH, DAVISON, and ARNOLD, JJ., concur.