Ambrose F. YAX, Plaintiff-Appellant,

Fred H. Helling, Intervenor-Appellant,

v.

DIT–MCO, INCORPORATED, F. L. Thompson, Frank S. Morgan, Jack Lipsitz, Rose Morgan, Lucian Piane, Sherman W. Dreiseszun, Florence O. Heller, Baltimore Bank, and George W. Higginbotham and Traders National Bank, Executors of the Estate of George P. Heller, Deceased, Defendants-Respondents.

No. 49587.

Supreme Court of Missouri,

Division No. 1.

March 11, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied

April 8, 1963.

Albert Thomson, Mark J. Klein, Kansas City, Linde, Thomson, Vandyke, Fairchild & Langworthy, Kansas City, of counsel, for plaintiff-appellant.

John B. Ewing, Jr., Phillip C. Houx, of Brenner, Wimmell, Ewing & Lockwood, Kansas City, for intervening appellant.

E. E. Thompson, Ivan E. Moody, Kansas City, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel, for respondents Dit-Mco, Incorporated, F. L. Thompson, Frank S. Morgan, Jack Lipsitz, Rose Morgan, Lucian Piane and Sherman W. Dreiseszun.

Joseph J. Kelly, Jr., Howard F. Sachs, Kansas City, Spencer, Fane, Britt & Browne, Kansas City, of counsel, for respondents Heller and Higginbotham and Traders National Bank, Executors of Estate of George P. Heller, Deceased.

HOLMAN, Commissioner.

This equitable action was instituted by plaintiff, Ambrose F. Yax, as a stockholder of defendant Dit-Mco, Inc., for himself and all others similarly situated, seeking a decree compelling certain defendants to hold in trust for the benefit of said corporation and all of its shareholders the benefits from a contract with defendants George P. and Florence O. Heller, whereby said defendants purchased from the Hellers 52,-643 shares of the stock of Dit-Mco. Another stockholder, Fred H. Helling, was permitted to file an intervening petition. Plaintiff and intervenor filed a motion for a temporary injunction in an effort to restrain defendants from voting that stock at the annual stockholders meeting in June 1961. After a hearing, that motion was overruled on June 1, 1961. Upon the final hearing the court found all of the issues in favor of defendants and accordingly entered a judgment for them. Plaintiff and intervenor have appealed.

The defendants in this case are Dit-Mco, Inc., hereinafter sometimes called the "Company"; F. L. Thompson, Frank S. Morgan, Jack Lipsitz, Rose Morgan, Lucian Piane, Sherman W. Dreiseszun, hereinafter sometimes referred to as "buyers" or as "purchasing defendants"; George P. Heller (until his death) and Florence O. Heller, his wife, hereinafter sometimes referred to as the "sellers"; Baltimore Bank, the escrow agent under agreements hereinafter described; and George W. Higginbotham and Traders National Bank who were substituted as defendants for George P. Heller who died prior to the final hearing and are now parties as executors of said decedent's estate.

Mr. Heller is described in the record as the parent of the Company. On the dates hereinafter mentioned there were approximately 223,000 shares of stock outstanding, of which Mr. Heller and his wife owned 67,500. For some time prior to March 1961, Mr. Heller had been chairman of the board and F. L. Thompson had been president of the Company. Both were also members of the board of directors, as was Frank Morgan. In June 1960, Mr. Heller told Thompson that he wanted to sell all of the stock he and his wife owned

in the Company. He desired to do so primarily because of the state of his health. For a time efforts were made to sell the entire Company but such a sale did not materialize. Mr. Heller also made an effort to sell the stock through a securities company but no sale in that manner was consummated. Finally, an effort was made by a group of stockholders to purchase the stock, and in February 1961 Mr. Heller suggested that he might sell his stock for $11 a share. Mr. Heller also expressed a desire that the Company acquire a portion of his stock because he knew that in March of that year there would be a dilution of the stock by the exercise of certain options whereby the Company had agreed to sell a large number of shares to certain officers and employees at a price considerably below the market price of the stock. After extended negotiations the sellers, on March 2, 1961, made a written offer to the board of directors to sell 14,857 shares of the stock to the Company at a price of $10.50 per share or a total of $156,000. On the same date, the sellers entered into a written agreement with the purchasing defendants whereby they agreed to sell to said purchasers 52,643 shares of their stock at a price of $11 per share or a total of $579,073. The purchasers agreed to buy said stock in accordance with the following percentages thereof: Frank Morgan, Rose Morgan and Sherman Drieseszun 16⅔% each, F. L. Thompson 25%, Lucian Piane and Jack Lipsitz 12½% each. It was agreed that stock certificates would be delivered to said purchasers for said stock, and that they would pay for same by executing a promissory note for the amount of the purchase price, dated April 1, 1961, which should bear interest at 5%, payable annually, and that the principal would become due and payable in five annual installments of $115,814.60, beginning on April 1, 1965, and ending on April 1, 1969. The stock was to be placed in escrow to secure the payment of the purchase price. The purchase agreement provided that the sale of the shares to the

purchasing defendants, as above outlined, was conditioned upon the acceptance by the Company of the offer of the sellers to sell 14,857 shares to it, as above mentioned, to be paid for in cash upon delivery of the stock certificate.

A meeting of the board of directors was held on March 4, 1961, with all five of the directors present, and a resolution was adopted authorizing the purchase of said shares of stock and the payment of the purchase price therefor. All of the directors voted in favor of that resolution except Mr. Heller who abstained from voting. Thereafter, the purchase of the shares by the individual defendants was consummated and the certificates for said shares were issued to said purchasers and delivered to the Baltimore Bank as escrow agent to secure the payment of the note given by said defendants for the purchase price of said stock. In addition to the 52,643 shares, said purchasers, in accordance with the sales agreement, also delivered to the escrow agent certificates of stock in the Company for a total of almost 15,000 shares as additional collateral security for the payment of said promissory note.

F. L. Thompson testified that as far as the purchasing defendants were concerned the two transactions whereby they and the Company each purchased stock were entirely separate; that he and Mr. Morgan had handled the negotiations for the sale and that the shares purchased were prorated among the purchasers in proportion to the number of shares they already owned; that he had objected to the two deals being combined into one contract but that such was done at the insistence of Mr. Heller's tax attorney because it was considered a necessary and advantageous procedure for Mr. Heller's tax purposes; that as far as the individual purchasers were concerned the purchase of their stock was not contingent upon the purchase of stock by the Company; that if the Company had not bought that stock "we would have bought it, and wanted to"; that at that time

the Company had $542,000 in cash, or its equivalent; that the Company had undertaken an extensive research program which required heavy expenditures, but the directors determined that an expenditure of $156,000 for the purchase of stock could prudently be made; that Mr. Heller had indicated that he wanted to sell the stock to them on a deferred payment basis so that he could have the interest income and also a tax advantage, but that he would not sell stock to the Company on a time payment basis.

The evidence indicated that the market price of the Company's stock on March 2, 1961, was approximately $11 per share, on May 18, 1961, was $17 a share, and on the date of the final hearing, February 28, 1962, was $16.50 per share. It was admitted by the parties, however, at the time of oral argument here (January 1963) that the market price of the stock at that time was approximately $6 per share.

In a deposition taken on April 14, 1961, plaintiff testified that he was employed as a salesman for Midland Securities Company of Kansas City. He stated that he owned 800 shares of stock in the Company and a corporation in which he was a stockholder owned another 800 shares; that he thought it was sound judgment for the Company to buy the 14,857 shares and he had no complaint concerning that transaction; that he filed the suit because he wanted the court to make an order that the Company "be the purchaser of all the stock" sold by the Hellers, or that all the stockholders be given the opportunity to buy the stock on a prorata basis.

We will first consider the question of our appellate jurisdiction. The shares of stock in question were purchased for $11 per share. At the date of the final hearing the market price was $16.50. That represented an increase in value of $289,536.50. Appellants contend that the Company, or all of the stockholders, should have the benefit of that appreciation in value. It would therefore appear that on the rec-

ord as it existed at the time the appeal was taken (June 1962) the amount in dispute exceeded $15,000. We are mindful of the fact that the market value in January 1963 was $6 per share and therefore, at that time, the purchasers had sustained a substantial loss and there was no profit from which the Company or the stockholders generally could benefit. We have recently said: "Certainly, none will question that the amount in actual dispute for jurisdictional purposes is determined at the time an appeal is taken, and that nothing that subsequently occurs should be invoked to confer jurisdiction which did not exist at the time of the appeal, and that the possibility or contingency that a subsequent event will reduce the amount that was *actually in dispute* at the time an appeal was taken should not deprive the court of the jurisdiction which it had at the time of the appeal." Snowbarger v. M. F. A. Central Cooperative, Mo.Sup., 317 S.W.2d 390, 393. We have concluded that we must determine the jurisdictional question from the facts appearing in the transcript as of the time the appeal was taken, and that we accordingly have jurisdiction by reason of the amount in dispute. Art. V, Sec. 3, Const. of Missouri 1945, V.A.M.S.; § 477.040, RSMo 1959, V.A.M.S.

Appellants contend that the trial court erred in finding the issues in favor of defendants because the purchase of the stock by the Company and by the purchasing defendants was one unified transaction in which the defendants Thompson and Morgan breached their fiduciary duty to the Company. For that reason it is said that the court should have decreed that the purchasing defendants hold the stock as constructive trustees for the benefit of the Company and its shareholders. In the final analysis appellants contend that the wrong committed by the purchasing directors was to cause the Company to buy 14,857 shares and pay $156,000 in cash therefor, which they say was a "down payment" on the total purchase of all of the Heller stock, and in that manner the pur-

chasing defendants were able to buy 52,643 shares upon a deferred payment basis without paying anything at the time of purchase.

■■ At the outset of our consideration of the questions presented certain well-established principles should be recognized. "The general rule is that officers and directors in control of a corporation occupy toward the corporation and its stockholders, in respect to the business or property of the corporation, a fiduciary relation somewhat in the nature of a trusteeship and cannot deal with the property of the corporation for their own personal benefit or advantage. But this duty does not extend to the outstanding stock of the corporation for the reason that such stock is the individual property of the respective stockholders and not in any sense the corporation's property. The corporation, as such, has no interest in the outstanding stock or in dealings among the stockholders with respect thereto unless restricted by charter or by-laws of the corporation." Adams v. Mid-West Chevrolet Corp., 198 Okl. 461, 179 P.2d 147, 156, 175 A.L.R. 554. We approve the statements in 13 Am.Jur., Corporations, §§ 1010, 1012, 1013, pp. 962, 965, 966, that "ordinarily, a corporate officer or director has a right to purchase the stock of a shareholder therein the same as any other person has a right to purchase such stock, and there is nothing in the mere fact that the purchaser is an officer or director of the corporation, the shares of which he purchases, from which fraud or unfair dealing may be inferred. * * * The general rule that an officer or director may purchase stock of his company from stockholders is especially applicable in the case of a purchase from a stockholder who is also a director and who has an intimate knowledge of the operations of the corporation. * * * [T]he directors are not by reason of their relation to the corporation prohibited from selling their stock to whomsoever they desire * * *."

■■ We have said that the "evidence to establish a constructive trust must be so clear, cogent, unequivocal and positive as to banish doubt from the chancellor's mind." Thomason v. Beery, Mo.Sup., 235 S.W.2d 308, 312. On the other hand, if it is established that directors have obtained a profit from dealing *with the corporation* "and the transaction is drawn in question as between them and the stockholders of the corporation, the burden is upon the directors to show that such transaction has been fair, open, and in the utmost good faith." Bromschwig v. Carthage Marble & White Lime Co., 334 Mo. 319, 66 S.W. 2d 889, 892.

■ There are certain conclusions herein about which there can be no question. The Hellers had a right to sell their stock to anyone they desired upon any terms mutually agreed upon between the sellers and buyers. The purchasing defendants had a right to buy all or any part of the Heller stock upon any terms that might be mutually agreed upon, and the director-defendants were under no obligation to give notice of the transaction to the stockholders generally. The board of directors could properly authorize the Company to purchase the shares it did purchase for a fair and reasonable price (conceded in this case) where it appears that the transaction was entered into in good faith and considered to be in the best interest of the Company. Appellants make no complaint (in fact, approve) of the purchase of the stock, in this instance, by the Company. But, as indicated, they contend that the director-purchasers have used their positions to cause the Company to purchase that stock, and, while it was not detrimental to the Company, said directors were enabled thereby to buy the remainder of the Heller stock on a deferred payment plan and thus make a personal profit which they should not be permitted to retain.

The difficulty with appellants' contention is that it is not supported by the facts as we find them. It should be borne in mind that

only two of the six purchasing defendants were officers or directors of the Company. They were a minority of the board of directors and did not constitute a majority of those who actually voted on the resolution to purchase the stock. Mr. Heller was interested in the welfare of the Company and knew that by reason of the terms of the contract with the purchasing defendants he and his wife (and their assignees or personal representatives) would continue to have a direct financial interest in the Company for at least nine years. Mr. Heller, as well as all of the other officers and directors of the Company, are bound to have known that it would have been extremely unwise for the Company to have purchased all of the stock, as appellants now contend should have been done. Such would have obligated the Company to pay more than $700,000. Of its $542,000 in current assets, $250,000 had been earmarked for the Company's research and development program which was already in progress. Obviously, a substantial part of the remaining $292,000 was required for operating capital. It was a consideration of those factors which caused the officers and directors to conclude that no more than $160,000 could prudently be used for the purchase of the stock deemed necessary to replace that which would be required to meet the option commitments of the Company, which would be exercised in March 1961.

Because of the effect upon his tax status, Mr. Heller desired that some, but not all, of the purchase price for his stock be paid at that time. He would not sell the 14,857 shares to the Company upon a deferred payment basis. While he may have had a number of reasons for that decision, one likely reason was that it would have been very poor business for the Company to have paid 5% interest upon the amount of the purchase price of that stock when it had the funds available with which to pay cash for same. It therefore was reasonable for Mr. Heller to require that the Company pay cash for its stock, and permit the stock sold to the purchasing defendants to be paid for by their personal installment note secured in the manner heretofore detailed. It should also be noted that he would not have sold any of the stock to the Company unless he was able to first consummate the sale to the purchasing defendants because, unless it was done in that manner, the gain received from the shares sold to the Company might have been ruled to be a dividend instead of a capital gain.

In connection with our decision, we find the following additional facts: (1) The payment of $156,000 by the Company to the Hellers for the 14,857 shares was not a "down payment" made for the purpose of enabling the purchasing defendants to buy the remainder of the Heller stock; (2) the Hellers would not have sold any more stock to the Company than they did sell and would not have sold any stock to it on terms other than for cash; (3) the purchasing defendants would have bought all of the Heller stock if said sellers had agreed to sell it to them; (4) the sale of the stock to the Company was a transaction which was fair, open, and entered into in good faith by the directors; (5) the sale of the stock to the Company was made a condition precedent to the sale of the remainder of the stock at the insistence of the Hellers for reasons personal to them and not for the purpose of enabling the purchasing defendants to buy stock in a manner advantageous to them; and (6) there has been no unjust enrichment on the part of said buyers and no discrimination against the rights of the Company or its stockholders by the officers and directors thereof.

As indicated by the foregoing, our conclusion is that appellants were not entitled to any relief and that the court properly entered a judgment for the defendants.

In support of their contentions appellants have relied primarily upon the following cases: Bromschwig v. Carthage Marble & White Lime Co., supra, 334 Mo. 319. 66 S.W.2d 889; Johnson v. Duensing, Mo. Sup., 351 S.W.2d 27; Proctor v. Farrar,

Mo.Sup., 213 S.W. 469; Irving Trust Co. v. Deutsch, 2d Cir., 73 F.2d 121; Elliott v. Baker, 194 Mass. 518, 80 N.E. 450; Schwab v. Schwab-Wilson Mach. Corp., Ltd., 13 Cal.App.2d 1, 55 P.2d 1268; and Commonwealth Title Ins. & Trust Co. v. Seltzer, 227 Pa. 410, 76 A. 77. Those cases all involve factual situations so different from the situation in the case before us that they may not be regarded as supporting the contentions of appellants. In the Bromschwig case a minority stockholder obtained relief upon a showing that a director, also manager, had used corporate funds in order to buy stock in the company for himself. In Johnson v. Duensing, a stockholder obtained relief because the directors had caused the company to sell some of its stock to one of the directors for less than its true value. In Proctor, relief was properly granted because the facts showed a wrongful appropriation of corporate funds by several directors who were authorized to sell certain corporate assets. In Irving, certain directors were shown to have taken over a contract (for their personal benefit) the corporation had entered into to purchase certain stock of another corporation. Elliott v. Baker involved the issuance of additional stock of the corporation by a majority of the directors and the sale thereof to an associate so that said directors could obtain control of the company. Likewise, in Schwab new stock was issued by the corporation and sold to one of the directors so that he could obtain control of the company, and, in Commonwealth the situation involved the fraudulent conduct of the president of the corporation in the purchase of the company's stock so as to indirectly accomplish the sale of certain real estate owned by the corporation for his personal profit when it was his duty to attempt to sell the real estate for the corporation.

The motion of respondents to dismiss plaintiffs' appeal because of alleged violation of Civil Rule 82.05, V.A.M.R. is overruled.

The judgment is affirmed.

COIL, C., not participating.

HOUSER, C., concurs.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.