276 F.Supp. 217 (1967)
Charles HEIT, Plaintiff,
v.
W. H. BIXBY et al., Defendants.
No. 64 C 118(1).
United States District Court E. D. Missouri, E. D.
August 7, 1967.
*218 Ackert & Tompkins, St. Louis, Mo., and Pomerantz, Levy, Haudek & Block, New York City, for plaintiff.
Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendants Bixby and others.
Guilfoil, Caruthers, Symington, Montrey & Petzall, St. Louis, Mo., for defendants Blumeyer and others.
Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for defendants St. Louis Fire & Marine Ins. Co. and others.
W. D. Rund, St. Louis, Mo., for defendant General Contract Finance Corp.

MEMORANDUM OPINION
HARPER, Chief Judge.
The following is a glossary of abbreviations which, for the sake of convenience, will be used throughout this memorandum opinion and order:
GCFCGeneral Contract Finance Corporation
SLFMSt. Louis Fire and Marine Insurance Company
SLICSt. Louis Insurance Corporation
ICSLInsurance Company of St. Louis
InsurorsGeneral Insurors, Inc.
WFMWashington Fire and Marine Insurance Company
The GroupSt. Louis Insurance Group (consisting of WFM, ICSL and SLFM)
This is a stockholder's derivative action in which the plaintiff, Charles Heit, a citizen of New York, is suing on behalf of GCFC, a Missouri corporation, against the individual defendants, W. H. Bixby, Frank C. Blumeyer, John W. Bowyer, Jr., Walter E. Burtelow, David R. Calhoun, George H. Capps, John L. Gillis, Edward G. Holtzman, Edward D. Jones, Chris J. Muckerman, Louis J. Orabka, A. H. Perry, Frederick G. Reiter, C. Harold Schreiber, Max P. Shelton and Stuart H. Smith, all Missouri citizens, and the corporate defendants, SLFM, SLIC and Insurors, all Missouri corporations. Four other individuals, Gwynne Evans, Roscoe Hobbs, Paul Jamison and Mike A. Moran, and ICSL were also named as party defendants in the original complaint filed on March 19, 1964.
*219 ICSL was dropped from the amended complaint filed on March 31, 1966.
On July 14, 1967, by leave of court, all of the parties stipulated to the dismissal without prejudice of Evans, Hobbs, Jamison and Moran.
The facts are before the court by way of oral testimony, stipulations of fact, admissions, answers to various interrogatories and numerous exhibits. This court has jurisdiction by way of diversity of citizenship and amount. The plaintiff's stock ownership in GCFC is conceded by all parties to have existed since April 19, 1961. (This court has already restricted any recovery to which the plaintiff might be entitled on behalf of GCFC to events occurring subsequent to this date. See Memorandum Opinion and Order filed in this action on February 8, 1967.)
The period of this lawsuit runs from April 19, 1961, the date the plaintiff first purchased stock in GCFC, to February 18, 1964, the date of the sale of GCFC's insurance interest in ICSL, to the defendants SLFM and SLIC. (This is more fully explained hereinafter.)
The facts disclose that in the early 1930's the defendant Insurors (then fifty percent owned by the defendant Muckerman) formed an insurance subsidiary, the defendant SLFM. Following its incorporation, and during the period of this lawsuit, SLFM was a wholly owned subsidiary of the defendant SLIC. SLFM was formed with the idea that it would have no officers or staff of its own, but would depend upon Insurors, who possessed the facilities, management and operation. Insurors hired and paid all of its employees and designated all of the officers of SLFM, and completely managed SLFM for a management fee.
In 1940, GCFC's predecessor formed an insurance subsidiary, WFM, to handle automobile insurance on cars which it financed. From the time of its organization until January 22, 1964, GCFC and its predecessor owned one hundred percent of WFM. WFM, like SLFM, had no staff or officers of its own. Insurors, at the request of GCFC's predecessor, agreed to manage WFM, hire and salary its employees, designate its officers, etc., for a management fee as it was then doing for SLFM. When this agreement was made it was made on behalf of Insurors by Blumeyer and Muckerman. They were told that the business was captive business and GCFC's predecessor only wanted management and that no part of the management fee was to be paid to anyone as a commission.
In 1950, WFM and SLFM jointly organized another insurance company, ICSL, and again, like WFM and SLFM before it, ICSL was without management of its own. From the date of its organization until the sale on February 18, 1964, GCFC and its predecessor directly and indirectly through its one hundred percent ownership of WFM, owned fifty percent of ICSL. WFM, ICSL and SLFM became known as the St. Louis Insurance Group (The Group). The Group, since none of its company parts had management of their own, was completely managed by the defendant Insurors for six percent of the gross premiums written by the Group as a whole during the period here involved.
The defendant Insurors continued to manage WFM and ICSL as part of the Group throughout the period of this lawsuit.
During the period of this lawsuit the defendant Muckerman was number one in command and the defendant Blumeyer was number two in command of the defendant Insurors, and both were ten percent shareholders. During the same period Blumeyer was a vice-president of GCFC, and both he and Muckerman were directors of GCFC. Both Blumeyer and Muckerman were officers and directors of WFM and ICSL, and SLFM (The Group) as well as officers, directors and shareholders of the defendant SLIC. The other individual defendants were all directors of GCFC at varying times throughout the period of this lawsuit.
The six percent fee paid by WFM and by ICSL for WFM's and GCFC's interest therein for management was split between *220 the defendant Insurors and the defendants Blumeyer and Muckerman, Insurors taking sixty percent thereof, and Blumeyer and Muckerman taking forty percent (twenty percent apiece) thereof. The forty percent was paid to Blumeyer and Muckerman as if it were a brokerage commission for business generated by them, and it did not appear on Insuror's books as income to Insurors. The amount of money which the plaintiff is seeking on behalf of GCFC with respect to the forty percent commissions during the period in suit is $563,689.00. The defendants concede that this figure represents the amount of money Blumeyer and Muckerman received under the forty percent arrangement attributable to GCFC's ownership of WFM and ICSL during the suit period.
The forty percent commission paid to Blumeyer and Muckerman was a well guarded secret. Only the defendant Perry had firsthand knowledge that such an arrangement existed, and even he did not know the exact percentage being taken. The defendant Burtelow became suspicious of the arrangement in 1951 after he was told by one Leo Kueper, an accountant who had inspected Insuror's books, that such an arrangement probably existed. Kueper inadvertently was shown the one set of Insurors' books which reflected the forty percent being turned over to Blumeyer and Muckerman. Immediately after Burtelow got this information he passed it on to Arthur Blumeyer, father of defendant Blumeyer, and president and chief operating officer of GCFC's predecessor. Subsequently, Burtelow on several occasions inquired of Blumeyer as to the forty percent arrangement, but such an arrangement was denied. The defendant Burtelow also asked the defendant Muckerman about the forty percent arrangement and was told to mind his own business.
Not only was the forty percent arrangement kept secret from the directors of GCFC, but it was also kept secret from the directors of Insurors, except Perry. The son of defendant Burtelow, Walter E. Burtelow, Jr., was a director and officer as well as a ten percent shareholder of Insurors from 1955 until 1964, and at no time was he informed of the arrangement. In 1963, Burtelow, Jr., and the defendant Burtelow had a conversation, at which Burtelow, Jr., compared his copy of Insurors' profit and loss statement for the year 1957 (Defendant Burtelow et al.'s Exhibit I) with the defendant Burtelow's copy (Plaintiff's Exhibit 35). The comparison revealed certain discrepancies, notably the fact that the full amount of the management fee did not show up on Burtelow, Jr.'s copy of the profit and loss statement (only the net amount, not the gross amount showed up). Thereafter, Burtelow, Jr. asked D. J. Hamman, accountant for Insurors, about the discrepancies, but, at first, he could not get the information he wanted. Burtelow, Jr. also had various conversations with the defendants Blumeyer and Muckerman, but at no time was he informed of the forty percent fee, even though the defendants Blumeyer and Muckerman knew he was seeking this information. Finally, he received a letter (Burtelow et al.'s Exhibit P) from Hamman in September, 1964, part of which is as follows:
"There are no undisclosed management fees that have been earned by General Insurors. General Insurors' books have always been kept on a net basis and the only items ever taken into income by General Insurors for the past 30 years is the net overwriting received by General Insurors after paying the brokerage commission and other expenses other than regular employees salaries covered by these fees. This applies, not only to the Management Contracts, but to our contracts with all of the companies General Insurors represents. The gross amount received from the Standard and American Casualty or the Group has never been reflected in any of our statements because it would be meaningless as this is not income to General Insurors, but instead is income owed to the individuals by agreement, such agreement having been in effect for over 30 years, and nothing would be gained by attempting *221 to show the gross amount. Such gross figures are available and if you will let us know exactly what figures you would like to have, on any of our contracts, we will be glad to furnish you with whatever you request."
Burtelow, Jr. was thereafter shown Insurors' books. After viewing the books, he circulated among the directors of Insurors a memorandum (Plaintiff's Exhibit 89) to the effect that if the directors of Insurors did not take action against the defendants Blumeyer and Muckerman to recover payments made to them on the management contract, he, as an individual shareholder, would. This demand was also put in a resolution offered at a directors' and shareholders' meeting of Insurors on or about February 5, 1965. Thereafter, Burtelow, Jr. settled his controversy for a considerable sum of money.
Further evidence of the fact that the forty percent commission was a secret is a letter (Defendant Burtelow et al.'s Exhibit B), dated April 30, 1952, from the defendant Blumeyer to his father (then chairman of the board of GCFC's predecessor) requesting that the management fee Insurors was to receive for managing the Group be increased from five percent to six percent. The letter in part said:
"The Washington at the present time is paying General Insurors * * * approximately $125,000 per year. Out of this $125,000 we have to pay all of the salaries and in addition you get rent, light, heat, air conditioning, telephones, furniture and fixtures, and all the other miscellaneous items which go into the running of any office."
At no place in the letter did the defendant Blumeyer mention the fact that forty percent of the money went to him and Muckerman. In fact, the letter suggests all of the money was used in running the office.
The defendants offered into evidence certain of GCFC's proxy statements, prospectuses, etc. These documents, while clearly showing that the defendants Blumeyer and Muckerman were directors and officers of Insurors as well as ten percent shareholders thereof and the existence and terms of the six percent management fee, in no way showed that Blumeyer and Muckerman were skimming forty percent of the management fee.
While various statements, prospectuses, etc., of GCFC through the years showed the percentage management fee and Blumeyer's and Muckerman's connection with the companies, when GCFC's predecessor in the late fifties was divided from one corporation to two, one of which was GCFC, the New York Stock Exchange officers (stock listed on this exchange) were skeptical of the arrangement between corporations with interlocking directors, and as a result Blumeyer and Burtelow made a trip to New York to talk to the New York Exchange representative about this arrangement. At that time the fee was discussed and Blumeyer explained it. No reference was made to the forty percent secret commissions, but it was stated the fee was used entirely in Insurors' operation covering expenses of managing the Group.
Following this meeting Burtelow asked Blumeyer if he and Muckerman were taking part of the fee besides their other compensation, and explained if they were it could only cause trouble. He was assured by Blumeyer that there was no secret commission being taken by him and Muckerman.
As officers of Insurors, Blumeyer and Muckerman received salaries and a regular commission for every insurance policy they sold. (Only the defendant Blumeyer actively sold insurance policies.) Furthermore, Insurors was akin to an incorporated partnership, having elected to be taxed by the Internal Revenue Service as a subchapter S corporation. Thus, Insurors distributed all of its annual income by year end and compensated members of the corporation (ten, ten percent shareholders) with bonuses set by the defendant Muckerman (including his own and the defendant Blumeyer's). Even though these payments were referred to by the *222 defendants Blumeyer and Muckerman as "bonuses", with respect to Blumeyer and Muckerman they were characterized on the books of Insurors as executive and/or office salaries, and were paid monthly exactly as if they were salary payments. These salary and commission payments amount to considerable sums of money, as the following breakdown of Blumeyer's additional payments during the suit period indicates:
1961Executive salary ($13,100), Office Salary ($13,100), and Commissions ($46,304).
1962The corresponding figures are: $23,380, $1,620, and $44,222.
1963The corresponding figures are: $23,280, $1,620, and $61,363.
Muckerman's salary and commissions, although not as large as Blumeyer's, were still substantial (1961$33,200, 1962 $20,200, and 1963$20,200). In view of these substantial payments to the defendants Blumeyer and Muckerman and of the fact that Blumeyer and Muckerman were only ten percent shareholders of Insurors, it is somewhat ludicrous for the defendants Blumeyer and Muckerman to characterize their forty percent commissions as a fair compensation for their services to Insurors. Further, they spent part of their time on other business endeavors.
The defendant Reiter became a director of GCFC in October, 1963. At that time CGFC's insurance subsidiaries, WFM and ICSL, were doing poorly and had unfavorable loss ratios generally attributed to a general downtrend in the areas of the casualty insurance field in which the Group was involved. Consequently, GCFC's interest in the Group was sold to the defendants SLIC and SLFM, GCFC realizing 4.3 million dollars net after taxes. The exact details of the sale or, more specifically, the basis of and the amount of money that GCFC should have realized from the sale is a matter in dispute, and the facts concerning this matter will be more fully developed later in this opinion.
In deciding the issues in this case the parties are in agreement that the court should be guided by Missouri law.
There are four primary issues in this case:
1) Was there a failure of the plaintiff, Charles Heit, to comply with the provisions of Rule 23.1, Federal Rules of Civil Procedure?
2) Assuming that the six percent management fee received by Insurors was a reasonable management fee, was the forty percent split illegal by virtue of the fact that it was undisclosed to the other directors and shareholders of GCFC coupled with the fact that Blumeyer and Muckerman were directors of all of the companies which were parties to the management contract, and if the forty percent split was illegal which of the defendants, if any, must account to GCFC? (The defendants SLIC and SLFM have previously been dismissed from this issue.)
3) Was there a miscomputation of the sale price of GCFC's interest in the Group, and if so, which, if any of the defendants, are accountable to GCFC for the deficiency?
4) In computing the sale price of GCFC's interest in the Group, was there a failure to take into account the value (if any) of WFM's and fifty percent of ICSL's claims to the secret commissions, and, if so, which of the defendants, if any, should make restitution to GCFC and in what amount? (Any failure to take into account here is limited to the suit period.)
With respect to the first primary issue, Rule 23.1, Federal Rules of Civil Procedure states, in part, to-wit:
"In a derivative action brought by one or more shareholders * * * to enforce a right of a corporation * *, the corporation * * * having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) * * * and (2) * * *. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the *223 directors or comparable authority and, if necessary, from the shareholders * * *, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interest of the shareholders * * * similarly situated in enforcing the right of the corporation * * *. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders * * * in such manner as the court directs."
The plaintiff concedes that no demand was made upon the directors and shareholders of GCFC, and relies upon his allegations in the amended complaint set forth to-wit:
"39. Plaintiff has refrained from a demand that the directors of the Corporation bring suit on the claims herein asserted because such a demand would be a futile act. All the directors of the Corporation (GCFC) participated or acquiesced in the transactions complained of and, in consequence, all the directors (with a single exception) are named as defendants. Any suit or suits, brought in pursuance of such a demand, would entail action by the directors against themselves. Any such suit, if brought would not be diligently prosecuted as arm's length.
"40. Demand upon the stockholders of the Corporation to bring this action would be futile because under the laws of Missouri and the charter and bylaws of the Corporation, the officers and directors, not the stockholders, manage its affairs, including the bringing of all actions. The stockholders as a body cannot by resolution manage the Corporation or compel its management to bring suit. Even if the stockholders had such power, any suits brought in pursuance of stockholders' resolutions directing their institution would leave conduct of the suit in the hostile hands of the Corporation's management."
In determining the adequacy of reasons alleged for excusing directorship and shareholder demand, all parties agree that state law (Missouri) applies.
The defendants, relying upon Saigh ex rel. Anheuser-Busch, Inc. v. Busch, 396 S.W.2d 9 (Mo.App.) as being dispositive of this issue, contend that due to the fact that the directors of GCFC (with the exceptions of Blumeyer, Muckerman and Perry, did not know of the forty percent arrangement, they would have heeded a demand to prosecute an action against Blumeyer and Muckerman. Further, the defendants contend that the plaintiff should have made demand upon the controlling shareholder interests of GCFC since Blumeyer and Muckerman were only 2½ percent owners of GCFC.
The defendants' contentions with respect to this issue are without merit. Saigh ex rel. Anheuser-Busch, Inc. v. Busch, supra, is dispositive of this issue, but it is dispositive in favor of the plaintiff. Saigh ex rel. Anheuser-Busch, Inc. v. Busch clearly and succinctly sets forth the law applicable to this issue at 396 S. W.2d 17, to-wit:
"While the rule stated above requires the stockholder who brings the derivative action to allege and show, if he failed with the directors, that he has made an honest effort to obtain action by the stockholders as a body and if this is not done, where it could not be done or that it was not reasonable to require it and would therefore be a futile act, the complaining stockholder need not make these allegations in his petition if his petition alleges that the officers and directors of the corporation violated the trust committed to them by perpetrating and doing ultra vires, illegal or fraudulent acts, because such acts cannot be ratified even by a majority of the stockholders. In such a situation equity will entertain an action for relief by a dissenting minority stockholder without first resorting or appealing to the stockholders as a body." (Cases cited.) (Emphasis added.)
*224 Here the plaintiff is suing all of the directors of GCFC for serious willful (in the case of Blumeyer, Muckerman and Perry) and negligent (in the case of the remaining individual defendants) breaches of their fiduciary duties to GCFC. The action will, therefore, not be dismissed for the plaintiff's failure to demand action on the part of the directors and stockholders of GCFC.
Furthermore, it is interesting to note two additional facts indicating that a demand on the directors and stockholders of GCFC would have been futile. First, the stockholders of GCFC reelected the defendants Blumeyer and Muckerman to two terms as directors of GCFC following the filing of this lawsuit. At least one of these was after depositions and after discovery in this suit had disclosed the forty-percent commissions. Second, the attorney of record and house counsel for GCFC, William Rund, announced at the beginning of the trial of this action that, although GCFC was taking a neutral position, it felt that the plaintiff should have made prior demands. This statement was made with the knowledge of the facts pertaining to the secret commissions obtained in discovery, and with the further knowledge the court had limited the period of the possible recovery of such secret commissions in this suit, which limitation as to period did not apply to GCFC.
The second primary issue above is comprised of four sub-issues: First, the liability of the defendants Blumeyer and Muckerman; second, the liability of the defendant Perry; third, the liability of the defendant Insurors; and fourth, the liability of the remaining individual defendants.
With respect to the first sub-issue above, the plaintiff contends that the receipt of the portion of the forty percent fee attributable to GCFC's one-half interest in the Group (one hundred percent of WFM and fifty percent of ICSL) constituted a breach of Blumeyer's and Muckerman's fiduciary duties to GCFC. In support of this contention (as with the other sub-issues above) the plaintiff offered no proof that the management fee itself or the forty percent commissions received by the defendants Blumeyer and Muckerman were unfair or unreasonable. The plaintiff asserts that evidence of the amount of the fees is irrelevant and that the forty percent fee was illegal because it was undisclosed and there was a conflict of interest. The plaintiff seeks to hold the defendants Blumeyer and Muckerman wholly accountable to GCFC for that portion of the forty percent commissions attributable to GCFC's interests in the Group. (The court has limited the period.)
The defendants Blumeyer and Muckerman, on the other hand, contend (as do the defendants Perry and Insurors) that in order for the plaintiff to recover for GCFC he must show, under the doctrine of General Rubber Company v. Benedict, 215 N.Y. 18, 109 N.E. 96, that the value of GCFC's stock in WFM and ICSL was diminished as a result of the defendants' acts, and that the plaintiff cannot show this because the six percent management fee contract between Insurors and the Group was completely fair and GCFC derived many years of profit from Insuror's management of WFM and fifty percent of ICSL as part of the Group. These defendants further contend that under the controlling Missouri law the liability of the defendants Blumeyer and Muckerman (as well as Perry and Insurors) is measured solely by the fairness of the management contract and the lack of financial loss or detriment to either WFM and ICSL or to GCFC.
This court will begin its determination of the liability of the defendants Blumeyer and Muckerman by assuming arguendo that the six percent management fee was fair and reasonable to GCFC and its subsidiaries WFM and ICSL. As noted in the facts set out above, the existence of the six percent management fee was fully disclosed to the directors of GCFC as were the ten percent interests which the defendants Blumeyer and Muckerman had in Insurors. However, the evidence shows a deliberate attempt on the part of the defendants Blumeyer *225 and Muckerman to keep the forty percent commissions a secret. If these two defendants are liable because the forty percent commissions were undisclosed, and because there was a conflict of interest, it will not be necessary to discuss in detail the fairness or unfairness of the six percent management fee or the forty percent commissions.
Unless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of his principal is under a duty to turn over such profits to his principal. This same rule applies with equal force to corporate directors who must account to the corporation for any undisclosed profit regardless of what it is called. Hornstein, Corporation Law and Practice, § 442. 3, Fletcher, Cyclopedia Corporations, § 884, states the rule as follows:
"Directors and other officers of a private corporation cannot either directly or indirectly, in their dealings on behalf of the corporation with others, or in any other transaction in which they are under a duty to guard the interests of the corporation, make a profit for themselves, or acquire any other personal benefit or advantage, even though such officer or director may own practically all of the stock of the corporation, and if they do so, they may be compelled to account therefor to the corporation in an appropriate action.
* * * * * *
"To state a rule broad enough to cover all the phases of the question is difficult. Oftentimes the rule, as stated, is confined to secret profits, but it is clear that it embraces more than secret profits. In any event, a director must account to the corporation or the stockholders for profits made by him out of corporate transactions, where he either concealed or did not disclose the extent to which he was making a profit out of the transaction. Stated in its most general form, the rule is that directors or other officers of a corporation cannot make a personal profit out of their office."
Turning to the Missouri law which is controlling in this matter, we find numerous cases dealing with this problem. Probably the most quoted case is Bromschwig et al. v. Carthage Marble & White Lime Co., et al., 334 Mo. 319, 66 S.W.2d 889 (1963). The court, l. c. 891-892, says:
"The duty that an officer or director owes to a corporation is well stated in the case of Barker v. Montana Gold, Silver, Platinum & Tellurium Mining Co., 35 Mont. 351, 89 P. 66, loc. cit. 70, wherein the Supreme Court of Montana said:
"`In equity, the directors of a corporation occupy a fiduciary relation to the corporation and its stockholders. Since they occupy this relation, they may not profit by virtue thereof at the expense of the corporation or the rights of the stockholders. They are required to exercise the utmost good faith in the discharge of the duties arising out of their trust, and to act for the corporation and its stockholders, giving all the benefit of their best judgment. If by dealing with the property of the corporation or its business for their own purposes, directly or indirectly, they derive a personal profit from it, they may be held trustees ex maleficio, as to such profits, for the benefit of the corporation and those stockholders who have suffered injury or deprivation by their conduct, and be compelled to restore what they have thus converted to their own use. (Citing cases.) And under the most favorable view of the authorities, where it appears that the directors have obtained any profit from dealing with the corporation, and the transaction is drawn in question as between them and the stockholders of the corporation, the burden is upon the directors to show that such transaction has been fair, open, and in the utmost good faith. (Citing case.)'"
The court further said, l. c. 892:
"Assuming that neither the company nor any stockholder suffered damage by the appellant's wrongful transaction *226 in using the company's funds to purchase the stock, we do not believe that in equity this should be any excuse for his unlawful conduct. We think it is immaterial whether or not the company or stockholder has been damaged.
"In the case of Bent v. Priest, 10 Mo.App. 543, loc. cit. 558, Thompson, J., speaking for the St. Louis Court of Appeals, said: `It is not essential to the liability of the director that the company has suffered a loss from what he has done; it is sufficient that he has gained a profit through it. Whether the contract which he has made, or in the making or ratification of which he has concurred, was in point of fact beneficial or injurious to the company, is wholly an immaterial inquiry. The broad principle is, that whatever he acquires by virtue of his fiduciary relation, except in open dealings with the company, such as a director in common with strangers may sometimes have, belongs not to him, but to the company. Nothing else than this satisfies the demands of the law.' (Italics theirs.)
"In the case of Western States Life Ins. Co. v. Lockwood, 166 Cal. 185, loc. cit. 195, 135 P. 496, 500, the Supreme Court of California said: `The corporation is entitled, of course, to recover secret profits obtained by a director or promoter by a violation of the obligations resting on him. It is entirely immaterial that the corporation may not have been damaged by the transaction in which they were made. See Bird, etc. Co. v. Humes (157 Pa. 278, 37 Am.St.Rep. 727, 27 A. 750), supra. Such secret profits belong, in view of the principles we have stated, to the corporation for the benefit of its stockholders. See, also, Farmers' & Merchants' Bank v. Downey, 53 Cal. 466, 31 Am.Rep. 62; Chandler v. Bacon (C. C.) 30 F. 538; Paducah, etc., Co. v. Hays (Ky.) 24 S.W. 237; Eden v. Rigsdales Co., 23 L.R.Queen's Bench Div. 368; Cook on Corporations, § 650.' (Italics theirs.)
"`A director or other officer may not either directly or indirectly derive any personal profit, benefit, or advantage by reason of his position that is not enjoyed in common by all the stockholders. He will not be permitted to retain any secret profits made by him in breach, or in disregard, of his fiduciary relation but will be required to account for such profits to the corporation. Neither will the courts enforce a secret agreement made by him with another person whereby he is to derive a personal benefit in fraud of the other stockholders. It is immaterial that the corporation was not damaged by the transaction in which the profits were made, or that he acted throughout in the highest good faith and without intent to injure the corporation.' 14A C.J. 122, par. 1891."
The defendants, Insurors, Blumeyer, Muckerman and Perry in their post-trial brief, at page 23, refer generally to this general body of law as the "fairness test" and contend that there has been a dramatic modification of this rule as a result of two recent Missouri cases. The first they refer to is Yax v. Dit-Mco, Inc., 366 S.W.2d 363 (Sup.Ct.Mo.1963), but the case does not modify this rule. At page 367, the court had this to say:
"At the outset of our consideration of the questions presented certain well-established principles should be recognized. `The general rule is that officers and directors in control of a corporation occupy toward the corporation and its stockholders, in respect to the business or property of the corporation, a fiduciary relation somewhat in the nature of a trusteeship and cannot deal with the property of the corporation for their own personal benefit or advantage. But this duty does not extend to the outstanding stock of the corporation for the reason that such stock is the individual property of the respective stockholders and not in any sense the corporation's property. The corporation, as such, has no interest in the outstanding stock or in dealings among the stockholders with respect thereto unless restricted by charter or by-laws of the corporation.' Adams v. *227 Mid-West Chevrolet Corp., 198 Okl. 461, 179 P.2d 147, 156, 175 A.L.R. 554."
It is evident from this that the court distinguishes the dealings in stock from the general rule with respect to directors. The court further said, l. c. 367:
"On the other hand, if it is established that directors have obtained a profit from dealing with the corporation `and the transaction is drawn in question as between them and the stockholders of the corporation, the burden is upon the directors to show that such transaction has been fair, open, and in the utmost good faith.' Bromschwig v. Carthage Marble & White Lime Co., 334 Mo. 319, 66 S.W. 2d 889, 892."
The court does not as these defendants contend modify the rule, but quotes from the Bromschwig case, supra, as the law which is that the only defense is the transaction was fair, open, and in the utmost good faith. Who is there that can say the forty percent fees taken by Blumeyer and Muckerman was open? The testimony is to the contrary.
The next modification in Missouri these defendants say came in Binz, etc. v. St. Louis Hide and Tallow Company, 378 S.W.2d 228 (St.L.Ct.App.1964). This case deals with salaries paid officers who were directors of the corporation, a completely different problem than that before the court. The matter of salaries is far afield from the action of Blumeyer and Muckerman. The court at page 231 said:
"See also 27 A.L.R. 300, 44 A.L.R. 570, 5 Fletcher Corporations, Sec. 2113, page 492. The basis of this rule of law is found in the prohibition against a director engaging in self-dealing. This has always been the law in Missouri. Hill v. Rich Hill Coal Mining Company, (1895), 119 Mo. 9, 24 S.W. 223; Bennett v. St. Louis Car Roofing Co., (1885), 19 Mo.App. 349; R. T. Davis Mill Co. v. Bennett, (1890), 39 Mo.App. 460; Frankford Exchange Bank v. McCune, (1934), Mo.App., 72 S.W.2d 155; Johnson v. Duensing, (1960), Mo.App., 340 S.W.2d 758, 768."
Among the cases cited as authority for the Binz decision is Johnson v. Duensing, 340 S.W.2d 758, 768 (Mo.App.1960). It is interesting to note what the court in part said at 768-769:
"The prevailing rule in this state, however, remains as quoted with approval by this court in Bromschwig v. Carthage Marble & White Lime Co., 334 Mo. 319, 66 S.W.2d 889, 892, 893, as follows:
"`A director or other officer may not either directly or indirectly derive any personal profit, benefit, or advantage by reason of his position that is not enjoyed in common by all the stockholders. He will not be permitted to retain any secret profits made by him in breach, or in disregard, of his fiduciary relation but will be required to account for such profits to the corporation. * * * It is immaterial that the corporation was not damaged by the transaction in which the profits were made, or that he acted throughout in the highest good faith and without intent to injure the corporation.'
"See, also Ford v. Ford Roofing Products Co., Mo.App., 285 S.W. 538; Keokuk Northern Line Packet Co. v. Davidson, 95 Mo. 467, 8 S.W. 545; Frankford Exchange Bank v. McCune, Mo.App., 72 S.W.2d 155.
"It is said by some authorities that such strict restrictions on the activities of a director no longer accord with the more modern view. 13 Am.Jur., Section 1001, Supp. 1958-59. `Fraud is not presumed. Domination or control of a corporation is not equivalent to fraud. A transaction is not actionable merely because the directors may derive an advantage from it.' 13 Fletcher Cyclopedia, Corporations, Section 5829.
"However, notwithstanding the view expressed by the courts in some jurisdictions on the subject, the policy of the law in this state has long continued to be as expressed in the Bromschwig case, supra, as quoted above. The result is, therefore, that regardless of the *228 sufficiency or insufficiency of the price paid by the defendant Proctor for the 200 shares of treasury stock sold to him, which price he, as a director, helped to fix, and which stock he later concededly resold at a profit, such sale to him was violative of the public policy of this state and, when attacked, is voidable on the ground of constructive fraud."
These defendants further say at page 27 of their brief: "Yax and Binz are representative of a sweeping national revision of the older rules which equated a director's role with that of the trustee of an express trust." If such be true, the Missouri cases are to the contrary and it is so emphatically expressed in the above quotation.
Further, the Supreme Court of Missouri a month after the Johnson case, supra, in Glassburn v. Lakeland Development Company, Mo., 340 S.W.2d 641, dealing with the purchase of property by a director of the corporation from the corporation. The court said, l. c. 644:
"The courts will uphold the purchase when, and only when, it was fairly and openly made for an adequate consideration and the corporation was adequately represented by other officers or directors." (Citing cases, among which is Bromschwig, supra.)
This further indicates no change in the Missouri rule. In the Glassburn case the director involved did not participate in the Board action involving the transaction.
The defendants, Insurors, Blumeyer, Muckerman and Perry, cite cases from other jurisdictions and Law Review articles, discussing their position with respect to the modification of the old rule, but we are dealing here with a case governed by Missouri law and the Missouri courts have spoken clearly on this problem, and decisions from other jurisdictions are not applicable.
The following quote from the post-trial brief of Blumeyer and Muckerman clearly demonstrates their accountability for the secret commissions (see page 33 of Post-Trial Brief of the defendants Blumeyer, Muckerman, Perry and Insurors):
"If a director has a personal interest in a transaction with his corporation, and he makes the existence of that personal interest known, the corporation is amply protected if the transaction is fair and reasonable, for the corporation can suffer no loss or detriment as a result of such transaction."
Here the defendants Blumeyer and Muckerman in no way, means or form made "the existence of that personal interest known." They did make known their ten percent personal interests in Insurors, but they did not make known their personal interest in the transaction which was not Insurors but was the management contract itself in which they took a forty percent secret commission.
The defendants Blumeyer and Muckerman (and the defendants Perry and Insurors) have also sought to counter the rule against director's secret profits by asserting that since the six percent management fee contract was reasonable, WFM and ICSL did not suffer any losses thereby, and, therefore, the value of GCFC's stock in WFM and ICSL was not diminished as is required by General Rubber Company v. Benedict, 215 N.Y. 18, 109 N.E. 96. In a memorandum opinion and order filed on November 4, 1966, this court declared that the plaintiff was entitled to bring the present suit under the doctrine of the General Rubber case, and in so doing this court stated that the plaintiff's recovery for GCFC (if any) would be based upon the diminution in value of GCFC's stock in WFM and ICSL. Thus, these defendants state that the plaintiff is seeking a "forfeiture" rather than damages.
This argument has no merit. The forty percent secret commissions received by the defendants Blumeyer and Muckerman were held by them in trust for WFM and ICSL. See Restatement, Restitution § 197. The failure of the defendants Blumeyer and Muckerman to turn over to WFM and ICSL something *229 which rightfully belonged to them certainly diminished the value of GCFC's stock interests in WFM and ICSL to the extent of the failure. Under Missouri law the defendants Blumeyer and Muckerman should account to GCFC for any commissions they received during the suit period attributable to GCFC's interests in ICSL and WFM during the suit period.
As noted above, in deciding that Blumeyer and Muckerman are accountable to GCFC for their secret commissions under the forty percent arrangement, this court has assumed arguendo that the six percent management fee contract was fair and reasonable to WFM and ICSL. The defendants undertook to prove the fairness of the six percent contract but their proof has utterly failed.
The only proof offered by the defendants in this respect were certain witnesses who, by comparing WFM and ICSL with other supposedly representative companies, stated that a six percent management fee was ordinary within the industry and reasonable and fair to WFM and ICSL. This comparison was for only one year, and the witnesses admitted one year was an insufficient comparison, it was purely hypothetical, and failed to take into account the fact that much of WFM and ICSL business was captive. Blumeyer and Muckerman were taking huge sums in the form of secret commissions every year from Insurors' management fee from WFM and ICSL, as well as taking their regular salary and commissions for sales from Insurors. To say the contract was fair and reasonable is to say that the salary of the two top officers of Insurors (Blumeyer and Muckerman) of approximately $250,000 a year is a fair and reasonable salary. These defendants' own witness, Blasch, knew of only two men in this country who held similar positions drawing salaries in the $200,000 a year bracket, in the fire and casualty field of insurance, and each of these men headed companies which had annual premium income of about four hundred millions dollars a year. Blasch further testified that he made a report (Insurors Exhibit 9) with respect to managing a company similar to the Insurance holdings of GCFC. In this report he set out the average compensation for the two top executives in a company comparable in size to what we are concerned with here at approximately $30,000 each with fringe benefits of some 28.5%. These figures are in line with the salaries drawn by Blumeyer and Muckerman, which they call bonuses. To say that the fee arrangement is fair and reasonable is to completely ignore the facts before the court. A secret commission of approximately $400,000 a year has been taken for the past several years from the entire group (one-half of this from GCFC insurance holdings), and there was sufficient money left from the fees to operate Insurors, including the payment to Blumeyer and Muckerman in excess of $20,000 a year salary. The figures themselves completely refute any claim that the fees are fair and reasonable.
In the second sub-issue above, the plaintiff seeks to hold the defendant Perry wholly liable as a collaborator in the defendants Blumeyer's and Muckerman's breaches of trust. In the third sub-issue above, the plaintiff seeks to hold the defendant Insurors wholly liable for the same reason. For convenience, both sub-issues will be treated together.
With respect to the second sub-issue, the plaintiff contends that the defendant Perry's guilty knowledge of the commissions being taken by the defendants Blumeyer and Muckerman (although not the exact amounts) renders him a collaborator in Blumeyer's and Muckerman's breaches of trust to GCFC, and makes him accountable to GCFC for the entire amount of commissions attributable to GCFC's stock ownership of WFM and ICSL even though he was not a director of GCFC during the entire suit period. With respect to the third sub-issue above, the plaintiff contends that the defendant Insurors was a collaborator in the breaches of trust committed by the defendants Blumeyer and Muckerman.
*230 The defendant Perry, on the other hand, asserts only the same defenses that were set forth by the defendants Blumeyer and Muckerman. The defendant Insurors also relies upon the same defenses set forth by the defendants Blumeyer and Muckerman, and, further, contends that it cannot be held to be a collaborator because it did not derive any benefits from Blumeyer's and Muckerman's breaches of trust.
In its memorandum opinion and order filed on November 4, 1966, this court stated:
"One who joins a fiduciary in the breaching of his fiduciary duties becomes jointly and severally liable with him for the breach. Banker's Life & Casualty Company v. Kirtley, 338 F.2d 1006, 1013 (CA 8), and see also Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418, Cross v. Cross, 362 Mo. 1098, 246 S.W.2d 801, and Campbell v. Webb, 363 Mo. 1192, 258 S.W.2d 595."
Clearly both the defendant Perry and the defendant Insurors joined the defendants Blumeyer and Muckerman in breaching their fiduciary duties. The defendant Perry was closely associated with both Insurors and GCFC, and also the defendants Blumeyer and Muckerman. He testified that he knew from their inception that the defendants Blumeyer and Muckerman were taking the secret commissions; however, he did not know how much was being taken. Despite his knowledge, the defendant Perry did absolutely nothing to inform the other directors of GCFC about the secret commissions, nor did he take any steps on his own to eliminate the secret commissions.
The defendant Insurors is guilty as a collaborator because it was the instrument through which the defendants Blumeyer and Muckerman were able to secrete the forty percent commissions. Insurors' argument that it derived no benefit from the breaches of trust would not eliminate its liability.
With respect to the fourth sub-issue above, the plaintiff contends that the remaining individual defendants breached their fiduciary duties to GCFC by negligently permitting and failing to apprise themselves of the forty percent arrangement.
The remaining individual defendants assumed arguendo that the defendants Blumeyer, Muckerman, Perry and Insurors would be held liable for the secret commissions (as they have been) and contend that their actions in no way contributed to any loss to GCFC and that they are not liable since they did not connive in the secret commissions and since ordinary care on their part would not have prevented the loss.
As a general rule a director of a corporation is not liable for the misconduct of a codirector where he has not participated in the misconduct, unless the loss is the result of his own neglect of duty. 3, Fletcher, Cyclopedia Corporations § 1089. The Missouri rule regarding the duty of a director of a corporation is set forth in Boulicault v. Oriel Glass Company, 283 Mo. 237, 223 S.W. 423, l.c. 426 and 427, to-wit:
"In a sense directors of a corporation `are trustees and agents of the corporation and stockholders. In general they are governed by the same rules as are applied to trustees and agents' (Bent v. Priest, 86 Mo. loc. cit. 482), and for a failure to discharge their obligations as such they become liable for corporate losses resulting therefrom (Thompson v. Greeley, 107 Mo. loc. cit. 590, 17 S.W. 962). The directors of a business corporation are vested with the control of its business (section 3347, R.S.1909), and this power entails an obligation to exercise ordinary care, to the end that the assets of the corporation shall not be lost or dissipated. This duty extends to all directors, as such, and renders them liable for losses resulting from negligence as well as from actual misfeasance. The care required of directors `is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the *231 statute and the usages of business should be taken in account' (quoted in Stone v. Rottman, 183 Mo. loc. cit. 573, 82 S.W. 82). While that case involved bank directors, yet the weight of authority and reason is that it is generally applicable; due consideration being given in each case to the character of the corporation. To some extent the rule depends upon the fact that directors, as such, usually serve without compensation other than that they receive by sharing with all stockholders in the prosperity of the corporation.
* * * * * *
"What care `ordinarily prudent and diligent men' would have exercised under the circumstances, in the capacity of directors only, depends upon (1) what the circumstances were, and (2) what course of ordinarily careful and prudent men is under such circumstances. Both these raise questions of fact to be determined by the trier of the facts."
Here it is not contended that these defendants participated in the misconduct of the defendants Blumeyer and Muckerman; it is only contended that they were negligent in not discovering the misconduct. These defendants, relying principally upon Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662, assert that since Blumeyer and Muckerman enjoyed a high reputation in the insurance field, they had no duty to spy on Blumeyer and Muckerman and discover the secret commissions, but that their only duty to GCFC and its stockholders was to be sure that the six percent management fee contract was reasonable and fair.
The directors of a corporation have a duty to manage the corporation, and it is negligence for the directors to leave the management of the corporation entirely up to others. The entrusting directors may be held liable for breaches of trust committed by the officers or directors to whom the management is entrusted, and reliance upon their apparent trustworthiness does not afford an escape from such liability. 3, Fletcher, Cyclopedia Corporations § 1071; and see McCormick v. King, 241 F. 737 (CA 9), and Boulicault v. Oriel Glass Company, supra.
The evidence in this case shows that these remaining individual defendants totally abdicated their duties to manage GCFC's insurance subsidiaries, WFM and fifty percent of ICSL, and they entrusted this phase of GCFC's operations to the defendants Blumeyer and Muckerman. This was done even though GCFC's insurance subsidiaries, WFM and ICSL, constituted a substantial segment of its net worth (about 25%). These defendants' token management of GCFC's operation of WFM and ICSL amounted to little more than a scanning from time to time of GCFC's proxy statements. Their attitude toward WFM and ICSL was one of absolute indifference, and these subsidiaries were seldom mentioned at board meetings of GCFC.
Only the defendants Burtelow and Holtzman even slightly concerned themselves with the management of WFM and ICSL. (This is true even though Holtzman at one time was on the Board of Directors of WFM.)
Bowyer's additional participation consisted of his asking a Washington University professor some rather nugatory hypothetical questions about whether he thought a six percent management fee was usual in the insurance field, and when he was told it was not unusual, his participation ceased.
The defendant Burtelow was told by an accountant (Keuper) in 1951 that Blumeyer and Muckerman were skimming forty percent of the management fee. Instead of informing the other directors of his findings, Burtelow imprudently accepted Blumeyer's denial that he and Muckerman were taking the secret commissions.
The lackadaisical attitude of these remaining defendants toward the management of WFM and ICSL certainly rendered them guilty of negligence. The remaining question, then, on this sub-issue is whether these defendants' negligence proximately caused or helped to *232 cause the loss to GCFC's subsidiaries, WFM and ICSL. That is, assuming these defendants had properly managed GCFC's interests in WFM and ICSL, could they, in the normal course of things, have discovered and prevented Blumeyer and Muckerman from skimming forty percent of the management fee?
That they would have is apparent. First, if these defendants had displayed some meaningful concern with GCFC's operation of WFM and ICSL, it is at least doubtful that Blumeyer and Muckerman would even have attempted to take the forty percent commissions. By leaving the management of WFM and ICSL to Blumeyer and Muckerman, the remaining directors provided them with a safe haven for chicanery. See Ventress v. Wallace, 111 Miss. 357, 71 So. 636.
Second, knowing of the extreme duality of loyalties of Blumeyer and Muckerman (GCFC, the entire Group, Insurors, and SLIC) the directors surely should have inquired as to Blumeyer's and Muckerman's participation in the management contract. These defendants argued that inquiries would have been futile as was the case with the defendant Burtelow. However, the evidence showed that Burtelow's son, after persistent inquiry, was able to get ahold of the proper books to determine that Blumeyer and Muckerman were taking the forty percent.
What has previously been said with respect to the New York Stock Exchange inquiry is ample evidence that the relationship of the parties to the corporations would arouse any prudent and diligent director's suspicion, if he carefully considered the arrangement.
Since these remaining defendants were negligent and their negligence was a proximate cause of GCFC's loss, they are liable jointly and severally with the defendants Blumeyer, Muckerman, Perry and Insurors for the amount of commissions taken by the defendants Blumeyer and Muckerman during the suit period attributable to GCFC's stock ownership of WFM and fifty percent of ICSL. Of course, the remaining individual defendants' liability will be tailored according to their respective tenures as directors of GCFC during the suit period attributable to GCFC's stock ownership of WFM and fifty percent of ICSL. Of course, the remaining individual defendants' liability will be tailored according to their respective tenures as directors of GCFC during the suit period.
In his answer the defendant Schreiber interposed the defense of the statute of limitations (five yearsSection 516.120, RSMo) on the theory that he was not served in the present action until November 7, 1966, whereas he asserts that the plaintiff's cause of action arose on April 19, 1961. The statute of limitations is not applicable in the present case. It is well settled that the statute of limitations does not commence to run against a cestui qui trust in the case of an expressed trust until the trustees (the individual defendants) repudiate the trust by some open act of which the cestui que trust can acquire knowledge. Newton v. Rebenack, 90 Mo.App. 650. Here the acts by the individual defendants were by no means open or apparent.
The third primary issue in this case concerns the alleged miscomputations of the sale price of WFM and ICSL. (The defendants SLIC and SLFM are included in this issue. The defendants Gillis, Smith and Burtelow are not included in this issue because their tenures as directors of GCFC ended before the sale of fifty percent of ICSL was consummated on February 18, 1964. The plaintiff did include the defendant Burtelow in this issue in a mistaken belief that his tenure as a director of GCFC was for the entire suit period; however, the plaintiff's own Exhibit 37 shows that his tenure ended on January 20, 1964.)
With respect to this issue the plaintiff contends that the sale of WFM and fifty percent of ICSL to the defendants SLIC and SLFM was not concluded for a bargained or negotiated net price of 4.3 million dollars after taxes as the defendants *233 contend, but rather the sale was made on the basis of a formula or computed gross figure which was to be 95% of the liquidating value of WFM and ICSL, and, therefore, the defendants are liable for any miscomputations made with respect to the price of the two companies. The plaintiff contends that the price of WFM and ICSL was miscomputed in the following particulars:

 1) Overlooking of WFM's indirect equity in ICSL's equity
 in unearned premiumsnet after provision for anticipated
 federal income tax on runoff at 52% $189,594.00
 2) Failure to take account of ICSL's tax loss carry forward
 in adjusting for its anticipated income taxes on
 runoff of equity in unearned premiums $ 72,452.00
 ___________
 $262,046.00
 Less 5% discount 13,102.00
 ___________
 Net Alleged Miscomputations $248,944.00

In his amended complaint the plaintiff alleged other miscomputations. However, in his final brief he has limited his allegations to the above.
The plaintiff has failed to prove his contentions on this issue. The evidence brought forth at the trial and through the exhibits, depositions, etc. shows the following:
In October of 1963, the defendant Reiter took over as president and became a director of GCFC. At this time it was apparent that GCFC would have to rid itself of its insurance subsidiaries, WFM and ICSL, or face bankruptcy. (WFM's and ICSL's loss ratio exceeded 100% and they were losing money due to a general downtrend in the casualty insurance business.) Consequently, Reiter, Blumeyer, and David Lichtenstein (a representative of the owners of five percent of the stock of GCFC) made numerous concerted efforts to sell WFM and ICSL, but they had no success. The lack of success can be attributed to the general downtrend in the field, and also to the fact that WFM and fifty percent of ICSL were without a sales organization or active management of its own. The defendant Perry tried to reinsure the "book of business" for the unearned premium reserve of WFM and ICSL, but he was unsuccessful.
Brice Frey, Jr., Vice-President of General Reinsurance Corporation, testified that his company would not reinsure WFM and ICSL because GCFC wanted non-cancellable provisions; at any rate, General Reinsurance would have insisted upon a one hundred percent reserve.
Perry also tried to find reinsurance through Leonhart & Company, reinsurance brokers, but Leonhart could not find reinsurance for WFM and ICSL even if it were to be on a freely cancellable basis.
The reason Perry's reinsurance efforts failed was because WFM's and ICSL's business was of a particularly risky type and contained many experimental risks.
On November 21, 1963, Reiter secured from the Board of Directors of GCFC a resolution which permitted the sale of WFM and ICSL. The resolution is set forth, to-wit:
"RESOLVED, that the President of this Corporation be and he is hereby authorized, empowered and directed to sell, liquidate or otherwise dispose of the holdings and investment of this Corporation in Washington Fire and Marine Insurance Company and Insurance Company of St. Louis for the best price or sum obtainable and in such manner and upon such terms and conditions as he shall deem for the best interests of this Corporation; provided, however, that this Corporation shall realize from the proceeds of any such sale, liquidation or other disposition a sum not less than $4,300,000 after the payment of all taxes, commissions *234 and all other expenses of sale, liquidation or disposition."
At about the time the above resolution was obtained it was apparent that GCFC could only dispose of WFM and ICSL to SCLIC and SLFM. This could be accomplished by either a merger or sale. A merger could have realized approximately 4.5 million dollars; however, in December of 1963 federal tax consequences scuttled any merger aspiration (the merger could not be accomplished on a tax free basis). It was then that Reiter and Blumeyer, with D. J. Hamman (accountant for Insurors) supplying the figures, began to work out a sale of WFM and fifty percent of ICSL to SLIC and SLFM.
The sale was accomplished without the benefit of a written contract (rather unusual considering the amount of money involved), and the following were the steps to be taken in the disposition of WFM and ICSL (evidenced by a letter from Hamman to Reiter on December 27, 1963, Plaintiff's Exhibit 83):

 "December 31, 1963
 "1. Washington Fire & Marine Insurance Company reinsures 100%
 of its outstanding liability with St. Louis Fire & Marine Insurance
 Company and Insurance Company of St. Louis.
 "January, 1964
 "1. St. Louis Fire & Marine Insurance Company purchases 100%
 of General Contract Finance Corporation's interest in Washington
 Fire & Marine Insurance Company.
 GCFC
 Gross Price $2,453,892 $2,453,892
 GCFC's Cost 1,641,395
 ___________
 Capital Gain 812,497
 25% Capital Gains 203,124 203,124
 __________
 Tax
 Net After Taxes $2,250,768
 "2. General Contract Finance Corporation receives dividend from
 Insurance Company of St. Louis.
 22.83175% of 3,500,000 $799,111 $ 799,111
 Portion paid from Earned
 Surplus 532,461
 __________
 Return of Capital 266,650
 7.8% Net Dividend Tax 41,532 41,532
 __________
 Net after Taxes $ 757,579
 "3. St. Louis Fire & Marine Insurance Company and St. Louis Insurance
 Corporation purchase General Contract Finance Corporation's
 22.83175% interest in Insurance Company of St. Louis.
 Gross Price $1,517,522 $1,517,522
 GCFC's Original
 Cost $ 880.695
 Return of Capital 266,650 614,045
 __________ __________
 Capital Gain $ 903,477
 25% Capital Gains Tax 225,869 225,869
 __________ __________
 Net After Taxes $1,291,653."

*235 The sale netted GCFC exactly 4.3 million dollars net after taxes; however, it is worthy of note that this amount was realized only after a mistake in the computation of taxes was discovered after the filing of the present lawsuit.
The defendants Reiter and Blumeyer flatly stated that the sale was to be for a negotiated after tax price of 4.3 million dollars. The other directors did not demonstrate any clear understanding of the exact basis for the sale.
In support of his contention that the sale was to be on a formula basis of 95% of liquidating value of WFM and ICSL the plaintiff relies primarily upon the following report which GCFC supplied the Securities Exchange Commission on March 16, 1964 (the SEC had required GCFC to give it the details of how the consideration for WFM and ICSL was computed. The report was prepared by William Rund, counsel for GCFC, and was signed by the defendant Reiter as president of GCFC), set forth in part, to-wit:
"Item 2(a). Acquisition or Disposition of Assets

"On January 22, 1964, General Contract Finance Corporation sold all of its interest in the capital stock of Washington Fire and Marine Insurance Company, consisting of 20,000 shares of Common Stock, to St. Louis Fire and Marine Insurance Company for a total cash consideration of $2,453,892.
"The sale of the capital stock of Washington Fire and Marine Insurance Company is part of a plan by which the Company will dispose of all of its investments in the fire and casualty insurance subsidiaries during the months of January and February, 1964. The total amount to be realized by the Company will be $4,770,525, of which $2,453,892 has been received from the sale of the capital stock of Washington Fire and Marine Insurance Company as above stated, $799,111 will be received in February, 1964 from Insurance Company of St. Louis as a dividend and $1,517,522 will be received upon the sale in February, 1964 of the capital stock of Insurance Company of St. Louis. The 2,283.175 shares, constituting 22.83175%, of the outstanding capital stock of Insurance Company of St. Louis owned by the Company, will be sold in February, 1964 as follows: 1,566.35 shares will be sold to St. Louis Fire and Marine Insurance Company for the sum of $1,044,451, and 716.825 shares will be sold to St. Louis Insurance Corporation for the sum of $473,071.
"Because there had been no market for trading in these securities, the principle followed in determining a fair market value was, among other factors, based upon (1) the liquidating value (the adjusted net asset value including a 40% equity in the unearned premiums) of the insurance companies, and (2) the quoted sale price to liquidating value ratios of other similar multiple line fire and casualty insurance company stocks being traded in the market. The total amount to be realized by the Company and determined by the management to be a fair and reasonable value is equal to 95% of the liquidating value of the Company's investment in the fire and casualty insurance subsidiaries." (Emphasis added.)
The plaintiff asserts that the italicized portions of the above quoted report show that the sale was to be on a formula basis as opposed to a negotiated price.
The most that the above report could show, and does show is that the price of WFM and ICSL is set by reference to their liquidating value. The report does not show upon what basis the sale was actually made.
Besides the above report the plaintiff relies upon vague references to liquidation contained in GCFC's proxy statement to its shareholders on March 30, 1964, to show that the sale was on a formula basis.
Thus, due to the fact that there was no written contract of the sale, evidence of the details of the sale is understandably *236 slim, such details being evidenced solely by the above report, the steps outlined by Hamman (see above), GCFC's proxy statement, and the testimony of the defendants Blumeyer and Reiter. It is not necessary for this court to determine whether the sale was on a formula basis or for a negotiated price because even if the sale of WFM and ICSL had been on the basis of a formula representing 95% of liquidating value, the plaintiff has still failed to prove the alleged miscomputations.
The plaintiff produced no evidence whatever, that the unearned premiums of ICSL were worth anything at the time of WFM's and ICSL's disposition, nor was there any evidence that SLIC and SLFM ever derived any profit from the unearned premiums of ICSL.
Similarly, the plaintiff produced no proof that ICSL's tax loss carryforward in adjusting for its anticipated income taxes on the runoff of equity in unearned premiums was worth anything. The failure to prove any value in the equity in unearned premiums ipso facto shows that the tax loss carryforward, based upon the value of those unearned premiums, had no value. At the time of the sale there were no prospects for a profitable future with respect to the insurance in force and effect for WFM and ICSL, and in fact, they lost money in 1964, 1965 and 1966.
The fourth and final primary issue concerns whether or not in arriving at a sale price for WFM and ICSL the parties failed to consider the value of WFM's and ICSL's claims for the secret commissions during the suit period. This court has found all of the individual defendants and Insurors liable for the secret commissions, and, therefore, in the interests of preventing a double recovery, this issue is limited to the defendants SLIC's and SLFM's liability.
With respect to this issue the plaintiff contends that the defendants SLIC and SLFM are liable to make restitution for unjust enrichment to the extent that they acquired enforcible choses in actions of WFM and ICSL.
By this decision in this case this court has completely compensated GCFC for the secret commissions taken by the defendants Blumeyer and Muckerman attributable to GCFC's ownership of WFM and ICSL. Thus, SLIC and SLFM neither paid for nor do they have choses in action (based upon their present ownership of GCFC's prior interests in WFM and ICSL) for the secret commissions. These defendants were, therefore, not unjustly enriched.
For the foregoing reasons this court holds that all of the individual defendants and Insurors are liable jointly and severally to the plaintiff on behalf of GCFC for the secret commissions attributable to GCFC's interests in WFM and ICSL taken by the defendants Blumeyer and Muckerman during the suit period. However, the individual defendants, other than the defendants Blumeyer, Muckerman and Perry, are liable only according to their tenures as directors of GCFC during the suit period. The court further holds that none of the defendants are liable for the alleged miscomputations of the sale price of WFM and ICSL or for the alleged failure in arriving at the sale price of WFM and ICSL to take into account the value of WFM's and ICSL's choses in action for the secret commissions during the suit period.
The amount of the damages to which the plaintiff is entitled on behalf of GCFC are undisputed. The secret commissions attributable to GCFC's interests in WFM and ICSL which Blumeyer and Muckerman received during the suit period amounted to $563,689.00, broken down as follows:

4/19/61-12/31/61 ......... $131,142.00
1962 ..................... 182,986.00
1963 ..................... 223,783.00
1/1/64-2/18/64 ........... 25,778.00

Therefore, the defendants Blumeyer, Muckerman, Perry and Insurors are liable jointly and severally for $563,689.00.
The defendants Bixby, Calhoun, Holtzman, Jones and Schreiber, all directors of GCFC during the entire suit period, *237 are also liable jointly and severally for $563,689.00.
The remaining individual defendants are liable jointly and severally as follows:

 Tenure Liability
Bowyer 4/18/63 - sale $182,831.00
Burtelow Inception - 1/20/64 547,021.00
Capps 11/16/61 - sale 456,380.00
Gillis Inception - 10/18/63 488,127.00
Orabka 4/19/62 - sale 384,211.00
Reiter 10/18/63 - sale 75,562.00
Shelton 4/18/63 - sale 182,831.00
Smith Inception - 4/1/62 170,298.00

At this juncture the court will decide the validity of the cross-claim for indemnity of the individual defendants, other than Capps, against the defendants Blumeyer, Muckerman, Perry and Insurors. The cross-claimants agreed to submit the cross-claim on the evidence brought forth at the trial of the primary action.
By their cross-complaint the cross-complainants contend that Blumeyer and Muckerman assured the cross-claimants that they were dealing fairly and reasonably within GCFC's insurance subsidiaries, when actually they were to receive secret commissions from the management contract. The cross-complaint prays that if judgment is entered in favor of the plaintiff (which it has been), such judgment should be entered solely against General Insurors and/or Blumeyer, Muckerman and Perry (which it has not been), or, in the alternative, it prays that the cross-complainants each have indemnity over against Blumeyer, Muckerman, Perry and General Insurors in the amount of any such judgment against each of the cross-claimants.
Under Missouri law when joint tortfeasors are in pari delicto, neither is entitled to indemnity from the other. Listerman v. Day and Night Plumbing and Heating Service, Inc., Mo.App., 384 S.W.2d 111. The question, then, is whether under the circumstances of this case the cross-claimants and the cross-defendants are in pari delicto.
After an exhaustive search this court has not been able to find a case involving the question of whether a director of a corporation who intentionally breaches his fiduciary duties is in pari delicto with other directors who unintentionally breach their fiduciary duties by negligently permitting his conduct.
However, there are numerous cases in Missouri dealing with negligent tortfeasors. In Woods v. Juvenile Shoe Corporation of America, 361 S.W.2d 694, where the defendant manufacturer and the defendant distributors were charged with negligence, the Supreme Court of Missouri said, in part, l. c. 697:
"The cross-claim states a claim upon which relief can be granted by way of indemnity for exposure of the indemnitee to liability for negligence by the act of indemnitor. * * * cross-claimants, under the allegations of their cross-claim, were not in pari delicto with the manufacturer; the manufacturer was charged with negligence as the original and primary wrongdoer, in actively creating a dangerous condition by manufacturing a shoe with a tack negligently caused to protrude into the inside or wearing surface of the shoe, and the cross-claimants were charged with negligence under their secondary duty to plaintiff. If the allegations of the cross-complaint be established upon trial on the merits cross-claimants would be entitled to indemnity for liability for negligence imposed upon them solely by their failure to discover and correct, remedy or prevent injury from *238 a dangerous condition caused solely by the party to be charged, not joined in by cross-claimants (authorities cited). Where one party creates the condition which causes injury and the other party does not join therein but is exposed to liability on account of it, the rule that one of two joint tortfeasors cannot maintain an action for indemnity against the other does not apply. (Case cited.) (Emphasis added.)
The principles laid down in the above quoted case are certainly applicable to this case where the individual cross-defendants actively breached their fiduciary duties by creating a situation which caused a wasting of the Corporation's insurance subsidiaries assets (and in the case of Insurors and Perry, participated in such situation), while the cross-claimants are exposed to liability for breach of their fiduciary duties in negligently permitting such a situation to exist. Equity demands that the cross-claimants be permitted to recover over against the cross-defendants Blumeyer, Muckerman and Insurors in the amount of the judgments against them. See also Kansas City Southern Railway Co. v. Payway Feed Mills, Inc., Mo., 338 S.W.2d 1, and Allied Mutual Casualty Corp. v. General Motors Corp., 10th Cir., 279 F.2d 455.
The defendant Perry was named as a cross-defendant in the cross-complaint. However, the cross-claimants do not seek indemnity against him in the prayer of the cross-complaint, nor do they mention him in their final brief. No indemnity will lie, therefore, against the defendant Perry.
The plaintiff is entitled to interest on any judgment recovered. Napoleon Hill Cotton Co. v. Stix, Baer & Fuller Dry Goods Co., 203 Mo.App. 25, 217 S.W. 323, from the date the money was received, and Sec. 408.020 V.A.M.S. sets the interest at six percent.
This memorandum opinion is adopted as this court's Findings of Fact and Conclusions of Law, and the clerk of the court is directed to enter judgment in favor of the plaintiff on behalf of General Contract Finance Company and against the defendants, other than the defendants SLIC and SLFM, in the amounts set out above, with interest at six percent per annum on $131,142.00 from January 1, 1962; $182,986.00 from January 1, 1963; $223,783.00 from January 1, 1964; and $25,778.00 from February 18, 1964.
The clerk is further directed to enter an order finding for the defendants SLIC and SLFM and against the plaintiff on behalf of General Contract Finance Company. The clerk is further directed to enter an order for indemnity in favor of the cross-claimants on their cross-complaint and against the cross-defendants, with the exception of Perry.